Dominick C. MORAN and Andrew C. Holland, Appellants–Defendants,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–9212–CR–427.

Court of Appeals of Indiana, Fifth District.

Dec. 13, 1993.

Robert W. Hammerle, Hammerle & Foster, John M. Moses, Indianapolis, for appellants-defendants.

Pamela Carter, Atty. Gen., Joseph F. Pieters, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee-plaintiff.

SHARPNACK, Chief Judge.

The interlocutory appeal filed by Dominick C. Moran and Andrew Holland challenges the denial of their motion to suppress evidence obtained through a police search of the residence shared by Moran and Holland. We affirm.

Moran and Holland present two issues for our review, which we restate as:

1. whether the trial court erred in finding that no reasonable expectation of privacy in trash put out for disposal exists under the Indiana Constitution; and

2. whether the trial court erred in finding that the motion to suppress should be denied under the good faith exception to the probable cause requirement.

The facts most favorable to the decision of the trial court are as follows:

From May of 1991 to April of 1992, the Indiana State Police ("ISP") operated Circle City Hydroponics ("CCH"), a retail supplier of hydroponic equipment and supplies located in Zionsville, Indiana, as a sting operation intended to identify persons who might be involved in marijuana cultivation and to provide leads for further investigation. Although products sold by CCH could be used in legitimate hydroponic operations, CCH specialized in those products and supplies commonly preferred by illicit cultivators of marijuana.

During the period between August 7, 1991 and February 18, 1992, Holland, at times accompanied by another man, made several visits to CCH. The two men purchased a total of $327.72 worth of supplies, including a lighting system, soil nutrients, and mylar sheeting, a reflective metallic material used to maximize the benefit of artificial lighting. The two men also had numerous conversations with undercover investigators in the store, including discussions of the growing facilities in Holland's home.

Based on Holland's patronage of CCH, the ISP conducted further investigation. Beginning in August, 1991, the ISP monitored Holland's electricity consumption, which averaged nearly double that of the previous occupant. On January 8, 1992, the ISP conducted a thermal imaging surveillance of Holland's residence. A thermal imaging device detects differences in the temperature of an object or structure being observed. The device detected several warm areas in Holland's residence which were unique when compared to other residences in the immediate neighborhood.

On or about January 22, 1992, at approximately 5:00 a.m., two ISP officers went to Holland's residence and removed the contents of several plastic garbage containers that had been set out for disposal at the end of the driveway in front of Holland's residence. The garbage containers were closed with lids and were approximately a foot from the edge of the street. The contents, which included several opaque plastic garbage bags and loose items, were dumped into the back of a pickup truck and taken to the ISP office, where the garbage bags were opened and sifted through for contraband. The officers found a green leafy substance which was later identified as marijuana plant clippings.

On April 20, 1992, a search warrant was issued for Holland's residence. The warrant was supported by the affidavit of Officer Timothy J. McClure of the ISP. On

April 22, 1992, the warrant was executed. Present in the residence at the time were Moran, Holland, and one other individual. Officers seized three bags of leafy material believed to be marijuana, several marijuana plants growing in buckets under lights in several locations throughout the house, and additional plants outside the residence in the yard. Informations were filed against Moran and Holland on May 1, 1992, charging each with possession of over 30 grams of marijuana.

On August 3, 1992, Holland filed his motion to suppress evidence, requesting the court to suppress all evidence and testimony related to the warrantless search of Holland's garbage and to the execution of the search warrant on April 22, 1992. On September 2, 1992, Moran filed his motion to suppress and the court conducted an evidentiary hearing on Moran and Holland's motions. On October 8, 1992, the court denied the motions to suppress, finding in each case that:

1. The Defendant did not have a reasonable expectation of privacy of garbage put out for disposal.

2. The search warrant was stale and therefore lacked probable cause[;] however the officers who secured the search warrant acted in reasonable reliance on a search warrant issued by a detached magistrate.

Therefore the evidence should not be suppressed according to the good faith exception set out in United States vs. Leon."

(Record, p. 11.)

## I

██ Moran and Holland present for our review an issue novel to Indiana but settled in several other states.[1] The appellants ask us to consider whether an individual has a reasonable expectation of privacy in trash put out for disposal, and, if so, whether the warrantless search of such trash is prohibited by our state constitution. In answering this question, we look to federal search and seizure law, particularly the United States Supreme Court's decision in *California v. Greenwood* (1988), 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30, and to Indiana law interpreting both the Fourth Amendment of the United States Constitution and Article I, § 11 of the Bill of Rights of the Indiana Constitution.

We consider first whether the warrantless search of Moran and Holland's garbage violated the United States Constitution. In *California v. Greenwood,* under similar factual circumstances, the Supreme Court considered the question before us. The defendant, Greenwood, was suspected of drug trafficking. After an investigation, a city police officer asked the regular trash collector to pick up the plastic garbage bags that Greenwood had left on the curb in front of his house and to turn the bags over to her without mixing their contents with garbage from other houses. This was accomplished, and items found in the trash were used in support of a warrant to search Greenwood's home. *Id.*

In finding the search to be constitutionally valid, the Court based its analysis on the Fourth Amendment jurisprudence in the line of cases stemming from *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, where the "expectation of privacy" test was formulated. This two-pronged test, adopted by the Indiana Supreme Court in *Blalock v. State* (1985), Ind., 483 N.E.2d 439, 441, determines whether Fourth Amendment protections have been violated by inquiring, first, whether an individual has exhibited "an

---

1. See, for example, the following cases from states which have found a reasonable expectation of privacy in curbside trash: *State v. Boland* (1990), 115 Wash.2d 571, 800 P.2d 1112; *State v. Hempele* (1990), 120 N.J. 182, 576 A.2d 793; *State v. Tanaka* (1985), 67 Haw. 658, 701 P.2d 1274. But see *State v. DeFusco* (1993), 224 Conn. 627, 620 A.2d 746; *People v. Hillman* (1992), Colo., 834 P.2d 1271; *State v. Fisher* (1991), Fla.Dist.Ct.App., 591 So.2d 1049; *State v. Bell* (1991), Tenn.Crim.App., 832 S.W.2d 583; *Commonwealth v. Perdue* (1988), 387 Pa.Super. 473, 564 A.2d 489; *State v. Henderson* (1988), Iowa Ct.App., 435 N.W.2d 394; *State v. Trahan* (1988), Neb., 428 N.W.2d 619; *State v. Stevens* (1985), 123 Wis.2d 303, 367 N.W.2d 788; *State v. Ronngren* (1985), N.D., 361 N.W.2d 224.

actual (subjective) expectation of privacy," and second, whether "society is prepared to recognize [that expectation] as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516. Although the first, "subjective" prong of the test has been largely discarded,[2] the concept of a "reasonable expectation of privacy" remains the primary determinant of whether a "search" has occurred for Fourth Amendment purposes. Only after a finding that a defendant's reasonable expectation of privacy has been violated do the defendant's Fourth Amendment protections become relevant. Our threshold inquiry, then, as it was in *Greenwood,* is whether Moran and Holland had a reasonable expectation of privacy under the Fourth Amendment.

The *Greenwood* Court found that an expectation of privacy in trash is unreasonable for three reasons: First, plastic garbage bags left at the curb are readily accessible to "animals, children, scavengers, snoops, and other members of the public." *Id.* 486 U.S. at 40, 108 S.Ct. at 1628. Second, garbage is placed at curbside "for the express purpose of conveying it to a third party, the trash collector, who might himself [sort] through [the] trash or permi[t] others, such as the police, to do so." *Id.* Third, the police "cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public." *Id.* at 41, 108 S.Ct. at 1629. Accordingly, the Court held,

"having deposited their garbage 'in an area particularly suited for public inspec-

tion and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' *United States v. Reicherter*, 647 F.2d 397, 399 (CA3 1981), respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded."

*Greenwood,* 486 U.S. at 41, 108 S.Ct. at 1629.

Moran and Holland contend that the present case is distinguishable from *Greenwood* because the garbage was taken by police directly from Holland's property, not after it had been picked up by the garbage collector. This distinction has no Fourth Amendment significance. As the Seventh Circuit wrote in *U.S. v. Hedrick* (7th Cir., 1991), 922 F.2d 396:

"The *Greenwood* Court did not base its decision solely upon the conveyance of the garbage to the collector.... [T]he court has never held that the intent to convey an object or conversation to a third-party renders any expectations of privacy unreasonable simply because the third-party could then convey the object or information to the police.

Therefore, the proper focus under *Greenwood* is whether the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable. This principle is not without any limit. The willingness of members of the public to trespass upon private property in order to search through garbage cans cannot automati-

**2.** In *United States v. White* (1971), 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, Justice Harlan, author of the *Katz* test, recognized that the privacy analysis must "transcend the search for subjective expectations or legal attribution of assumption of risk." *Id.* at 786, 91 S.Ct. at 1143 (Harlan, J., dissenting). A commentator has noted:

"An actual subjective expectation of privacy obviously has no place in a statement of what *Katz* held or in a theory of what the fourth amendment protects. It can neither add to, nor can its absence detract from, an individual's claim to fourth amendment protection. If it could, the government could diminish each person's subjective expectation of privacy merely by announcing half-hourly on television that ... we were all forthwith being

placed under comprehensive electronic surveillance."
Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 384 (1974). The novelist's imagination illuminates this grim possibility:

"There was of course no way of knowing whether you were being watched at any given moment.... It was even more conceivable that they watched everybody all the time.... You had to live—did live, from habit that became instinct—in the assumption that every sound you made was overheard, and, except in darkness, every movement scrutinized."
George Orwell, *1984* 4 (1949), quoted in Lewis R. Katz, *In Search of a Fourth Amendment for the Twenty-first Century*, 65 Ind.L.J. 549, 562 n. 57.

cally defeat the Fourth Amendment expectation of privacy any more than a series of burglaries could eliminate any expectation of privacy in the home. Where, however, the garbage is readily accessible from the street or other public thoroughfares, an expectation of privacy may be objectively unreasonable because of the common practice of scavengers, snoops, and other members of the public in sorting through garbage. In other words, garbage placed where it is not only accessible to the public but likely to be viewed by the public is 'knowingly exposed' to the public for Fourth Amendment purposes."

*Id.* at 400.

■ The facts of the present case fit the framework created by *Greenwood* and *Hedrick*. As noted, the garbage containers were placed at the edge of the driveway approximately one foot from the street, a location readily accessible to the public. An examination of Defendant's Exhibit F, a photograph of the intersection of Holland's driveway and the street, reveals that an individual wishing to rummage through the contents of a garbage container placed at that location would not even need to step onto Holland's property to do so. Accordingly, we find that the warrantless police search of Moran and Holland's trash did not violate the Fourth Amendment.

Next, we must determine whether the Indiana Constitution protects trash put out for disposal from unreasonable searches and seizures.

■ The terms of the Indiana Constitution's protections against unreasonable search and seizure are virtually identical to those of the Fourth Amendment. The Indiana provision reads as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause,

supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Article I, § 11, Ind. Const. The principle of the supremacy of federal law over state law prohibits Indiana courts from placing limitations on individual rights found to exist under the federal Constitution by the United States Supreme Court; we may, however, impose higher standards on searches and seizures than required by the federal Constitution if we choose to do so. *Cooper v. California* (1967), 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730.

The federal Constitution operates to provide at least a minimal protection to citizens no matter in what state the issues may arise. However, it by no means limits the expansiveness of rights provided to those in a particular state, which may freely provide greater protection of individual liberty than the federal Constitution requires. As the *Greenwood* court noted, "Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution." *Greenwood*, 486 U.S. at 43, 108 S.Ct. at 1630. Our deference to the United States Supreme Court in matters of federal constitutional interpretation must not obscure our duty to give effect to our own constitution and, "where in the State court's view those provisions afford greater safeguards than the Supreme Court would find, to make plain the State decisional ground so as to avoid unnecessary Supreme Court review." *People v. Scott* (1992), 79 N.Y.2d 474, 583 N.Y.S.2d 920, 939, 593 N.E.2d 1328, 1347 (J. Kaye, concurring). This we shall endeavor to do.

■ The Bill of Rights of the Indiana Constitution exists precisely to prevent state intrusion on the liberties of individuals.[3] Indiana has a proud tradition of protection of individual liberty that has not

---

**3.** A cogent exploration of the states' role in protecting individual liberties may be found in Indiana Supreme Court Chief Justice Randall T. Shepard's article, *Second Wind for the Indiana*

*Bill of Rights,* 22 Ind.L.Rev. 575 (1989). Several of the examples of Indiana constitutional farsightedness cited in this opinion were drawn from Chief Justice Shepard's article.

depended for its vigor on the guidance of the interpretation of the federal Constitution by the United States Supreme Court. At a time when slavery was tolerated under the federal Constitution, it was prohibited in Indiana, and Indiana would not lend support to its enforcement. *State v. Laselle* (1820), Ind., 1 Blackf. 60, 62 ("[T]he framers of our constitution intended a total and entire prohibition of slavery in this State; and we can conceive of no form of words in which that intention could have been more clearly expressed."). In 1854, more than a century before the United States Supreme Court's decision in *Gideon v. Wainwright* (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, the Indiana Supreme Court provided indigent criminal defendants with the right to an attorney at public expense. *Webb v. Baird* (1854), 6 Ind. 13, 18. One hundred years ago, at a time when the U.S. Supreme Court had concluded that women were not suited to the practice of law, the Indiana Supreme Court admitted to practice Antoinette Dakin Leach. *Bradwell v. Illinois* (1872), 83 U.S. (16 Wall) 130, 21 L.Ed. 442; *In re Leach* (1893), 134 Ind. 665, 34 N.E. 641. In 1987, six months before the United States Supreme Court's decision in *Coy v. Iowa* (1988), 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857, the Indiana Supreme Court affirmed a defendant's right to a "face-to-face" confrontation with the witnesses giving evidence against him in a child molestation case. *Miller v. State* (1987), Ind., 517 N.E.2d 64.

Indiana courts also have shown independence from federal constitutional interpretation in protecting Indiana citizens against unreasonable search and seizure. Nearly forty years before *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, the Indiana Supreme Court adopted the exclusionary rule in *Callender v. State* (1922), 193 Ind. 91, 96, 138 N.E. 817, 818, a holding which continues to be relied upon by Indiana courts. *See Dolliver v. State* (1992), Ind., 598 N.E.2d 525, 527; *Benefiel v. State* (1991), Ind., 578 N.E.2d 338. In 1973, in *Adams v. State,* 260 Ind. 663, 299 N.E.2d 834 (1973), the Indiana Supreme Court found the removal of bullets from a defendant's body to constitute an unreasonable search on state constitutional grounds, independent of the U.S. Supreme Court cases *Rochin v. California* (1952), 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, and *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908:

> "The Court was careful to leave open to the states the power to fix the parameters of permissible police investigative conduct. Thus, in our view, we are free, within the limits of the applicable constitutional provisions, to determine the permissible scope of searches and seizures of the kind here before us."

*Adams,* 299 N.E.2d at 836. Recently, this court held that the "inadvertence" requirement for meeting the "plain view" search warrant exception, abrogated by the U.S. Supreme Court in *Horton v. California* (1990), 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112, may still be applicable under the Indiana Constitution. *Wood v. State* (1992), Ind.App., 592 N.E.2d 740, 742.

At the same time, unfortunately, it must be noted that Indiana search and seizure cases are based almost exclusively upon interpretation of the Fourth Amendment rather than our own search and seizure clause, a practice which ignores the potential for developing a jurisprudence based upon Art. I, § 11 of the Indiana Constitution. Our holding today reflects our conviction that we are not required "to engraft on our state constitution each and every decision of the United States Supreme Court construing the scope of the Fourth Amendment." *People v. Hillman* (1992), Colo., 834 P.2d 1271 (J. Quinn, dissenting).

 It is well settled in Indiana law, under interpretations of both the federal constitution and our state constitution, that the constitutional guaranty against unreasonable search and seizure must be liberally construed. *Riddle v. State* (1971), 257 Ind. 501, 275 N.E.2d 788; *Idol v. State* (1955), 233 Ind. 307, 119 N.E.2d 428; *Dalton v. State* (1952), 230 Ind. 626, 105 N.E.2d 509; *Flum v. State* (1923), 193 Ind. 585, 141 N.E. 353. Our courts have held that in all cases involving search and sei-

zure claims, the initial question to be answered is whether the aggrieved individuals had any personal and legitimate expectation of privacy in the place searched. *Perkins v. State* (1985), Ind., 483 N.E.2d 1379.

Ownership and possession, while not determinative of an expectation of privacy, are considered relevant factors. *State v. Machlah* (1987), Ind.App., 505 N.E.2d 873, 876. Thus, a legitimate expectation of privacy has been found to exist in a home by virtue of residence or ownership, *Johnson v. State* (1985), Ind., 472 N.E.2d 892, 899; in a hotel room, which, as the occupant's transitory home, provided the same expectation of security from intrusion as an occupant would have in his own home, *Mowrer v. State* (1983), Ind.App., 447 N.E.2d 1129, 1131–32; and in an automobile, but only attaching to the owner of the vehicle, not a passenger, *Pollard v. State* (1979), 270 Ind. 599, 388 N.E.2d 496, 502–03. A privacy interest also has been found in containers that conceal their contents from public view, such as luggage in the possession of an owner or bailee, *Robles v. State* (1987), Ind., 510 N.E.2d 660, 663; a purse seized during an arrest, *Johnson v. State* (1980), Ind.App., 413 N.E.2d 335, 336; or a satchel found in a drawer during a raid of a motel room, *Ceroni v. State* (1990), Ind. App., 559 N.E.2d 372, 374.

An expectation of privacy, therefore, has been considered reasonable under Indiana law when attached to a place of residence, whether temporary, permanent, rented, or owned, or to the contents of a closed, opaque container when the container is the subject of a possessory interest. As in the several jurisdictions where this issue has been considered, legal concepts of privacy and possession are intertwined here, and the nexus between search and seizure jurisprudence and property law has proven particularly nettlesome. The paradox seems to be that while "abandonment" of property does not necessarily connote an abandonment of privacy expectations in it,[4] in the absence of some possessory interest in the contents of a container or of a residence, no rational expectation of privacy can exist. In other words, an expectation of privacy in an object or space is an abstract notion until it is claimed by an individual. The question before us is not whether a bag of trash may have a reasonable expectation of privacy, but whether persons may expect reasonably that their privacy interests in the concealed contents of their trash bags will be respected.

In resolving this question, we must look beyond precedent to a consideration of "general social norms." *Robbins v. California* (1981), 453 U.S. 420, 428, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744, ("[e]xpectations of privacy are established by general social norms"), *overruled on other grounds, United States v. Ross* (1982), 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572. These norms are reflected at their extremes in the law, but they are also reflected, less violently and with fewer clear demarcations, in our notions of correct behavior toward one another. Our attitude toward our garbage may, in fact, be reflective of our attitude toward each other and the inherent conflict between our interdepen-

---

**4.** Justice Brennan's dissent in *Greenwood* asserts:

> "[E]ven the voluntary relinquishment of possession or control over an effect does not necessarily amount to a relinquishment of a privacy expectation in it. Were it otherwise, a letter or package would lose all Fourth Amendment protection when placed in a mailbox or other depository with the 'express purpose' of entrusting it to the postal officer or a private carrier; those bailees are just as likely as trash collectors (and certainly have greater incentive) to 'sort[t] through' the personal effects entrusted to them, 'or permi[t] others, such as police to do so.'"

*Greenwood*, 486 U.S. at 55, 108 S.Ct. at 1637 (Brennan, J., dissenting). Similarly, "[t]he contents of our garbage cans may be unvalued trash, but it is nonetheless *our* unvalued trash." *U.S. v. Hedrick*, 922 F.2d at 400 (Cudahy, J., dissenting) (emphasis in original).

> "Courts using 'abandonment' in the property-law sense have also overlooked whether, far from losing their expectation of privacy in discarded possessions, people sometimes throw things out in order to maintain their privacy. A more pragmatic Emma Bovary might throw away the love letters from her Monsieur Leon to prevent her husband from discovering them in her rosewood desk."

*State v. Hempele*, 576 A.2d at 809.

dence and our need to preserve the sanctity and privacy of our homes.

Garbage is, by its very nature, the leavings of the wide range of human activity, and there are many secrets that garbage may disclose:

"A single bag of trash testifies eloquently to the eating, reading, and recreational habits of the person who produced it. A search of trash, like a search of the bedroom, can relate intimate details about sexual practices, health, and personal hygiene. Like rifling through desk drawers or intercepting phone calls, rummaging through trash can divulge the target's financial and professional status, political affiliations and inclinations, private thoughts, personal relationships, and romantic interests."

*Greenwood*, 486 U.S. at 50, 108 S.Ct. at 1634 (Brennan, J., dissenting). "Business records, bills, correspondence, magazines, tax records, and other telltale refuse can reveal much about a person's activities, association, and beliefs." *State v. Tanaka*, 701 P.2d at 1276–77. Most Hoosiers would, we believe, not only consider the scrutinizing of their trash an intrusion upon their privacy, but would treat such activity as a breach of civilized behavior.

If an individual places contraband in an open container or in clear plastic bags at the side of the road, the police "cannot reasonably be expected to avert their eyes from evidence of criminal activity that could [be] observed by any member of the public." *Greenwood* 486 U.S. at 41, 108 S.Ct. at 1629. Certainly, however, to put trash into an opaque plastic bag, tie the bag shut, place the bag into a can, place a lid on the can, and place the can at the edge of one's property for the sole purpose of having the trash collector take it and mingle it with the trash of thousands of other citizens is to manifest an expectation that it will remain secure and private, at a minimum, until removed by the trash collector.[5] We find this expectation to be a reasonable one on the grounds that it is consistent with the norms of civilized behavior in our society [6] and consistent with the law of search and seizure of closed, opaque containers.

We must determine next if the police conduct in performing the warrantless search of Moran and Holland's trash falls within one of the recognized exceptions to the warrant requirement. Under Indiana law, warrantless searches are presumptively unreasonable, and the burden is placed on the state to show that the search falls within one of the recognized exceptions to the warrant requirement. *Ceroni v. State* (1990), Ind.App., 559 N.E.2d 372, 374. The common thread underlying the recognized exceptions is the concept of "exigent circumstances" which render the procurement of a warrant impractical or inadvisable because of a danger of harm to individuals or the potential destruction of evidence. See *Robles v. State* (1987), Ind., 510 N.E.2d 660, 664. Clearly, no "exigent circumstances" existed in the present case; if the police had probable cause to search Moran and Holland's trash, time was not a factor preventing the issuance of a warrant.

---

**5.** "What a person ... seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz, supra,* 389 U.S. at 351–52, 88 S.Ct. at 511.

**6.** We note that in support of their argument Moran and Holland cite sections 13–3 and 13–6 of the Indianapolis Municipal Code concerning the collection and transportation of trash. Section 13–3 states, in pertinent part, that residential trash is presumed to be abandoned and that the owner's rights are relinquished only upon collection and removal. Section 13–6 states, in pertinent part, that no person not an employee of the city may take trash from any premises or upon the street for the purposes of selling or using it. Moran and Holland construe these ordinances as manifesting "a Hoosier's inherent expectation of privacy in trash set out for collection." (Appellants' Brief, at 9–10.) We disagree. The existence of an ordinance regulating the collection of trash is not dispositive on the issue of reasonableness of an expectation of privacy. These ordinances serve to facilitate the orderly collection of trash and to prevent the scavenging of residential trash by junk purveyors and the like. However, the ordinances do provide a basis for reinforcement and encouragement of such an expectation and to that extent their existence supports our finding that a expectation of privacy in trash set out for collection is reasonable.

" 'We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.' "

*Ceroni, supra,* 559 N.E.2d at 375 (quoting *McDonald v. U.S.* (1948), 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153. The ISP seized Moran and Holland's trash as part of a complex and undoubtedly expensive undercover operation. The procurement of a warrant under these circumstances would not have presented an undue burden on law enforcement.

Accordingly, we conclude that the trial court erred in finding that Moran and Holland had no reasonable expectation of privacy in trash put out for disposal. The warrantless trash search violated the protection against unreasonable search and seizure found in Art. I, § 11 of the Indiana Constitution.

## II

Moran and Holland next argue that the trial court erred in denying their motions to suppress evidence obtained during the search of their residence on the basis of the "good faith" exception expressed in *U.S. v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677. For the sake of clarity, we emphasize that two searches are at issue here—the warrantless trash search of January 22, 1992 (the "trash search") and the search of Moran and Holland's residence of April 22, 1992 (the "residence search").

The trial court based its decision on two grounds. First, the defendants "did not have a reasonable expectation of privacy of garbage put out for disposal," and therefore the fruits of the warrantless trash search were properly used to support probable cause for the warrant for the residence search. Second, despite the fact that the "search warrant was stale and therefore lacked probable cause," the police officers' reliance on the warrant satisfied the *Leon* "good faith" exception. Moran and Holland argue that Ind.Code § 35–37–4–5,[7] which creates a "good faith" exception to the warrant requirement (the "Indiana exception"), controls over the "good faith" exception expressed in *Leon* (the *"Leon* exception"), and that the requirements of the Indiana exception were not met. Moran and Holland argue in the alternative that even if the *Leon* exception were found to apply, the search warrant was still insufficiently supported by probable cause. We disagree with both arguments. After an examination of the record, we find that the motion to suppress was properly denied.

■ We begin by inquiring whether the evidence obtained during the trash search properly could be used to support the court's determination of probable cause in issuing the warrant for the residence search.

Under § 35–37–4–5(b)(1)(B), evidence obtained pursuant to a "judicial precedent ... or court rule that is later declared unconstitutional or otherwise invalidated" may not be excluded on that ground. Under Issue I

7. The pertinent sections of I.C. § 35–37–4–5 read as follows:

"(a) ... the court may not grant a motion to exclude evidence on the grounds that the search or seizure by which the evidence was obtained was unlawful if the evidence was obtained by a law enforcement officer in good faith.

(b) For purposes of this section, evidence is obtained by a law enforcement officer in good faith if:

(1) it is obtained pursuant to:

(A) a search warrant that was properly issued upon a determination of probable cause by a neutral and detached magistrate, that is free from obvious defects other than nondeliberate errors made in its preparation, and that was reasonably believed by the law enforcement officer to be valid; or

(B) a state statute, judicial precedent, or court rule that is later declared unconstitutional or otherwise invalidated ..."

I.C. § 35–37–4–5.

above, we hold that the Indiana Constitution protects a person's reasonable expectation of privacy in trash put out for collection. At the time when the warrant was issued, however, no Indiana court had ruled on the issue of warrantless searches of curbside trash. Therefore, it was reasonable for the officers to determine the legality of the warrantless search by reliance on *Greenwood.* One of the officers who participated in the trash pickup testified as follows concerning instructions he received from his superiors on that day:

"Basically we were told that as long as the trash was out for collection that we had the authority to collect it. If it was up next to the house or somewhere up near the yard or, you know, several feet in the property, we weren't to take it."

(Record, p. 98.) These instructions, consistent with the holding in *Greenwood,* may be considered evidence of the officer's good faith in accordance with I.C. § 35–37–4–5(b)(1)(B). We find, therefore, that our holding today does not invalidate the fruits of the trash search in supporting the magistrate's finding of probable cause.

■ We turn next to the question of whether the warrant was sufficiently supported by probable cause to render credible a police officer's reliance upon it under either the *Leon* exception or the Indiana exception.

■ The *Leon* exception and the Indiana exception both allow the admission of evidence seized in good faith reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be defective. *Leon,* 468 U.S. at 927, 104 S.Ct. at 3422–23; I.C. § 35–37–4–5(b)(1)(A). The *Leon* exception was adopted in Indiana in *Matter of M.R.D.* (1985), Ind.App., 482 N.E.2d 306, 310, and *Stabenow v. State* (1986), Ind.App. 495 N.E.2d 197. Moran and Holland contend that the Indiana exception controls over the *Leon* exception because it is a stricter limitation on police conduct in that it includes the additional requirement that the search warrant be "properly issued upon a determination of probable cause." The questions before us, then, are whether the standard for application of the Indiana exception differs from that of the *Leon* exception and whether either exception is applicable here.

The *Leon* decision grew out of the Court's desire to implement the purpose of the exclusionary rule, which it envisioned as "to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon,* 468 U.S. at 916, 104 S.Ct. at 3417. At the same time, the Court attempted to build upon an evolving "balancing approach" to the exclusionary rule that examined the costs and benefits of suppressing reliable physical evidence. *Id.* at 913, 104 S.Ct. at 3415. The particular "costs" of concern to the court were that the "unbending application of the exclusionary sanction ... would impede unacceptably the truth-finding functions of judge and jury," resulting in a situation where "some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains." *Id.* at 907, 104 S.Ct. at 3412.

In *Leon,* the warrant in question was judged by the district court to have been erroneously issued because the information supporting the affidavit was "fatally stale" and the informant's credibility had not been sufficiently established. *Id.* at 904, 104 S.Ct. at 3410–11. Nonetheless, the Supreme Court held that suppression was inappropriate. "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926, 104 S.Ct. at 3422. Suppression otherwise would be appropriate

"if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial

role ...; in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' *Brown v. Illinois*, 422 U.S. [590], at 610–611, 95 S.Ct. [2254], at 2265–2266 [45 L.Ed.2d 416 (1975)] (POWELL, J., concurring in part); see *Illinois v. Gates, supra*, 462 U.S. [213], at 263–264, 103 S.Ct. [2317], at 2345–2346 [76 L.Ed.2d 527 (1983)] (WHITE, J., concurring in the judgment). Finally, depending on the circumstances of a particular case, a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Id.* 468 U.S. at 923, 104 S.Ct. at 3421. The Court went on, however, to state: "In so limiting the suppression remedy, we leave untouched the probable-cause standard and the various requirements for a valid warrant." *Id.* This disclaimer parallels the "properly issued" language in the Indiana Code provision quoted above, and reaffirms that the standards required of judges and magistrates in issuing a warrant are unaffected by the good faith exception. It also demonstrates an important aspect of both *Leon* and I.C. § 35–37–4–5: each is focused on police conduct in obtaining and executing a search warrant, not the conduct of judges or magistrates. The "good faith" exception does not apply to judges or magistrates; if a judge or magistrate "abandons his judicial role" or is not "detached" or "neutral," no "good faith" will save the warrant. Thus, the same defects will preclude application of either the *Leon* exception or the Indiana exception. If the warrant is based on false information knowingly or recklessly provided by an affiant, if the warrant is sufficiently facially deficient, or if the warrant is based on an affidavit sufficiently lacking in indicia of probable cause, the evidence produced thereby may be properly suppressed.

■ We find, therefore, that the standard for application of the Indiana exception may be interpreted consistently with the *Leon* exception, despite the codification of I.C. § 35–37–4–5 in 1983, one year before *Leon*. In the three existing cases applying both *Leon* and I.C. § 35–37–4–5, no inconsistency has been found. *Stabenow v. State* (1986), Ind.App., 495 N.E.2d 197; *Utley v. State* (1992), Ind., 589 N.E.2d 232; and *Bradley v. State* (1993), Ind., 609 N.E.2d 420.

■ In the present case, the trial court denied Moran and Holland's motion to suppress specifically on the basis of the *Leon* decision. The court found, despite the fact that "[t]he search warrant was stale and therefore lacked probable cause," the officers had "acted in reasonable reliance on a search warrant issued by a detached magistrate." (Record, p. 11.) We need not address the question of whether the court erred in finding the search warrant to be stale. The age of inculpatory information is only one element that magistrates should consider in determining whether probable cause exists. *United States v. Pless* (7th Cir.1992), 982 F.2d 1118. If other factors indicate that the information is reliable and that the object of the search will still be on the premises, the magistrate should not hesitate to issue the warrant. *United States v. Batchelder* (7th Cir.1987), 824 F.2d 563, 564. Passage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity. *Pless, supra*, 982 F.2d at 1126 (citing *United States v. Lamon* (7th Cir. 1991), 930 F.2d 1183, 1188).

■ Moran and Holland argue that the affidavit is "so bare bones that no reasonably well trained police officer could have relied on its validity," (Appellants' Brief, p. 17) or, to restate this argument using the *Leon* exception, that the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Our review of the probable cause determination is limited to an examination of the same information that was before the magistrate when the warrant was issued. *Ruth v. State* (1984),

Ind.App., 462 N.E.2d 269, *trans. denied.* An affidavit demonstrates probable cause to search premises if it provides a sufficient basis of fact to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime. *Utley v. State* (1992), Ind., 589 N.E.2d 232, 236. The decision to issue the warrant should be based on the facts stated in the affidavit and the rational and reasonable inferences drawn therefrom. *Id.* Sufficiency need not rest on a single piece of information, but rather in the way the pieces fit together. *Id.*

The only information before the magistrate in the present case was the affidavit of Officer Timothy McClure of the ISP. The affidavit runs seventeen double-spaced pages and incorporates two attachments, one describing Holland's residence, the other listing the objects of the search. The affidavit details the ISP sting operation, the process of hydroponic marijuana cultivation, and the ISP surveillance of Holland and one other individual. The affidavit contains the following facts which support the issuance of a warrant: (1) In conversations with ISP agents working at CCH, Holland discussed growing techniques peculiar to marijuana cultivation, mentioned another hydroponics retailer he had previously patronized, a number of whose customers had been convicted of marijuana cultivation, and described his own growing operation. (2) Holland purchased products at CCH commonly used in marijuana cultivation. (3) ISP surveillance of Holland's electricity use showed a rate of consumption of nearly twice that of the previous occupant. (4) Thermal imaging of Holland's residence showed warm areas around the roof and garage, inconsistent with other residences in the neighborhood. (5) The ISP search of Holland's trash revealed marijuana plant clippings and irrigation paraphernalia. Based on these facts, we find it reasonable for the magistrate to have found probable cause to issue the search warrant and reasonable for police officers to have relied on its validity.

Accordingly, the trial court's denial of Moran and Holland's motion to suppress is affirmed.

AFFIRMED.

GARRARD and RUCKER, JJ., concur.