STATE of Indiana, Appellant–Plaintiff,

v.

W. Burke THOMAS, Appellee–Defendant.

No. 81A01–9404–CR–114.

Court of Appeals of Indiana,
First District.

Oct. 26, 1994.

Pamela Carter, Atty. Gen., Geoff Davis, Deputy Atty. Gen., Indianapolis, for appellant.

Timothy Bookwalter, Greencastle, for appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

The State of Indiana appeals from the trial court's order granting W. Burke Thomas's motion to suppress evidence obtained as a result of the State's covert video surveillance of Thomas in a state-owned and licensed concession located on state property. The State claims that Thomas did not have a reasonable expectation of privacy in the concession and, thus, that the video surveillance was not an illegal warrantless search.[1]

We affirm.[2]

### ISSUE

We restate the issue presented for review as two questions:

1. Whether Thomas had a reasonable expectation of privacy in the state-owned and licensed concession.

2. Whether the trial court erred when it granted Thomas's motion to suppress the

---

1. This appeal is taken pursuant to Indiana Code § 35-38-4-2(5).

2. We heard oral argument in Richmond on September 15, 1994.

evidence obtained as a result of the State's covert video surveillance.

## FACTS

On February 22, 1992, the Indiana Department of Natural Resources (DNR) and Thomas entered into a license and concession agreement to allow Thomas to operate a campstore at the Whitewater State Park. The campstore is located on land owned by the State of Indiana. The license allowed Thomas to operate the campstore and provide certain goods and services as specified in his license. The State retained some authority over the operations and management of the campstore.[3] In exchange for the license, Thomas agreed to pay the DNR a monthly fee consisting of ten percent of all gross sales of the business, excluding vending sales. The license required Thomas to maintain the campstore and to supervise the business and operate the business according to law.

Thomas came under suspicion when the Chief of Inns, Gary Miller, visited the campstore on three different occasions over a month and noticed questionable sales methods. On one occasion, Miller's purchase was not rung up on the cash register and on two occasions the cash register drawer remained open at all times. Miller requested that conservation officers of the DNR investigate to determine whether sales at the campstore were being transacted properly.[4]

Miller met with Conservation Officer Kenneth Luttman and discussed the possibility of installing video cameras inside the campstore in order to view cash register transactions. Miller believed that such action was appropriate because the State owned the store and

it was located on state property. No effort was made to obtain a search warrant authorizing the installation. After his meeting with Miller, Officer Luttman contacted Lt. McIntire of the "Special Investigations Unit" of the DNR. Lt. McIntire agreed to accompany Luttman to the campstore after business hours to determine whether video cameras could be installed. Because Thomas locked the campstore every night after closing to secure it from entry, the officers had to obtain a key from the DNR property manager, Merle Gentry. Gentry agreed to cooperate with the conservation officers and provided Officer Luttman a key to the building.

During the night of August 24, 1992, after business hours, Luttman and another conservation officer used Gentry's key to access the campstore and investigate the attic, where they found electricity available for use. The officers decided to return to the campstore attic early on the morning of August 26 and install video surveillance cameras and equipment. Around midnight the next evening, the officers returned to the campstore, unlocked the door, drilled a hole in the ceiling and installed and aimed the video cameras "strictly over the cash register." Record at 310–11. The officers programmed the equipment to record from 10:00 a.m. to 10:00 p.m. each day, which coincided with the campstore's business hours. Over the course of the next week, conservation officers entered the store each night after business hours to replace each video tape with a new blank tape. After collecting four recorded tapes, the officers returned to the campstore late one night, again after hours, and removed the video camera.

---

**3.** The license contains a number of provisions which indicate the extent of the State's authority over the premises and over the operation of the campstore. Included among those provisions, by way of illustration, are the following: (1) the DNR does not grant exclusive rights to the entire property where the concession is located, nor vest in the Licensee any title, tenure or property which belongs to the DNR; (2) the DNR is charged with management of the property, including providing maintenance and determining hours of operation, and shall make all decisions regarding what concessions will be offered for sale; (3) the DNR requires that all cash register tapes be sent to it with a monthly report of the

cash receipts and checks for all sums due; (4) a list of prices, rates and charges proposed to be used in the operation of the concession must be submitted to the DNR for prior approval; and (5) the records of operation shall be open to inspection and audit by the DNR at all reasonable times during business hours.

**4.** *See* IND.CODE § 14–3–4–9(b) (conservation officer is "law enforcement officer" under Indiana Code §§ 9–13–2–92(a)(5) and 35–41–1–17(a)(4), and is "police officer" under Indiana Code § 9–13–2–127(a)(5)).

The collected video tapes allegedly showed that the store had received significantly more revenue than Thomas had reported to the State. The State obtained more incriminating evidence when it confronted Thomas and his employees with the tapes. Thereafter, the State charged Thomas with two counts of theft. After a hearing on Thomas's motion to suppress, the trial court granted his motion and suppressed both the videotaped evidence and the subsequent incriminating statements of Thomas and his employees. We will state additional facts where necessary.

## DISCUSSION AND DECISION

### Standard of Review

■ The State contends the trial court erred when it granted Thomas's motion to suppress evidence obtained as a result of the State's covert video surveillance of Thomas in the campstore. In his motion, Thomas asserted that the State's surveillance constituted an illegal warrantless search. Hence, in suppressing such evidence, the trial court implicitly concluded that the State had violated Thomas's reasonable expectation of privacy and that an illegal warrantless search had occurred.

The State bore the burden of proof at trial to show that the search fell within an exception to the warrant requirement. *See State v. Jorgensen* (1988), Ind.App., 526 N.E.2d 1004, 1006. Therefore, the State is appealing from a negative judgment and on appeal must show that the trial court's ruling was contrary to law. *State v. Blake* (1984), Ind. App., 468 N.E.2d 548, 550. We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court. *Id.* We consider only the evidence most favorable to the judgment and do not reweigh the evidence or judge the credibility of the witnesses. *State v. McLaughlin* (1984), Ind.App., 471 N.E.2d 1125, 1136, *trans. denied.*

### Reasonable Expectation of Privacy

■ We are asked to consider whether Thomas had a reasonable expectation of privacy against being videotaped in his licensed concession located on State property and, if so, whether the warrantless search was a violation of Thomas's constitutional rights. Like this court's recent decisions considering whether an individual has a reasonable expectation of privacy in trash put out for disposal, we are again presented in this case with a search and seizure issue novel to Indiana. *See Moran v. State* (1993), Ind. App., 625 N.E.2d 1231, *trans. pending; Bell v. State* (1993), Ind.App., 626 N.E.2d 570, *trans. pending.* In answering the question presented, we look to both federal and Indiana search and seizure law.

■ Both the Fourth Amendment to the United States Constitution and Article I, § 11 of the Indiana Constitution protect people from unreasonable government intrusions into those aspects of a person's life where he or she has a legitimate expectation of privacy. The basic purpose of these constitutional provisions is to safeguard the privacy and security of individuals against arbitrary invasions by government officials. *Camara v. Municipal Court* (1967), 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930. Our supreme court has adopted a two-part "expectation of privacy" test, announced in *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, to determine when a person's expectation of privacy may be deemed reasonable. *See Blalock v. State* (1985), Ind., 483 N.E.2d 439, 441.

■ Under that test, we must inquire, first, whether one has exhibited an actual, subjective expectation of privacy and, second, whether that expectation is one which society would recognize as reasonable. *Katz,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588. In applying this test, the question of whether an individual has a "reasonable expectation of privacy" is the primary determinant of whether a "search" has occurred for constitutional purposes. *Moran,* 625 N.E.2d at 1235. In other words, a search occurs when an expectation of privacy, which society considers reasonable, is infringed. *United States v. Jacobsen* (1984), 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94. The defendant's Fourth Amendment protections become relevant only after a finding that a defendant's reasonable expectations of priva-

cy have been violated. *Moran,* 625 N.E.2d at 1235.

■ Whether an actual, subjective expectation of privacy is one that society would recognize as objectively reasonable is a question of law. *United States v. Taketa* (9th Cir.1991), 923 F.2d 665, 669. Here, Thomas maintains that he had a subjective expectation of privacy in the campstore as shown by the fact that, among other things, he locked the doors each night to keep others out of the store. He also claims the license and concessions agreement gave him certain rights of possession which support his subjective expectation of privacy and render it reasonable.[5] By granting Thomas's motion to suppress, the trial court effectively determined that his subjective expectation was one society would recognize as reasonable. Accordingly, we must ascertain at the outset whether the record before us supports a determination that Thomas has a reasonable expectation of privacy in the campstore. *See Perkins v. State* (1985), Ind., 483 N.E.2d 1379, 1383.

## A. Video Surveillance in a Public Place

The State asserts that its video surveillance did not violate Thomas's reasonable expectations of privacy inasmuch as Thomas's conduct was openly exposed to members of the public who used the state-owned campstore. The State's premise is that the area was not searched because it was not a constitutionally protected area and that Thomas had no reasonable expectation of privacy on the licensed premises in that the recorded transactions occurred during business hours in a place accessible and visible to the public. Thus, the State concludes, video surveillance of such an open, visible and public area does not require a warrant. While we acknowl-

edge that the scope of the search performed by the DNR conservation officers was limited to the observation of transactions conducted during business hours in a "public place," we cannot agree with the State's premise.

The constitutional issue of whether a search occurred is not resolved simply by a determination that the scope of the surveillance was limited to the observation of transactions conducted during business hours in a public place. In determining the reasonableness of a person's expectation of privacy on these facts, a correct analysis requires that we also consider (1) the surreptitious means by which the video surveillance was accomplished, including the location of the equipment and the method utilized to place it there, and (2) the degree of intrusion inherent in the continuous nature of video surveillance. The State ignores these significant factors.

■ Ownership and possession, while not determinative alone, are relevant factors in an evaluation of whether one has an expectation of privacy. *State v. Machlah* (1987), Ind.App., 505 N.E.2d 873, 876, *trans. denied.* Indeed, a person may have a subjective expectation of privacy that becomes objectively reasonable in an area of his or her workplace. *Taketa,* 923 F.2d at 672; *see Marshall v. Barlow's Inc.* (1978), 436 U.S. 307, 311–12, 98 S.Ct. 1816, 1819–20, 56 L.Ed.2d 305, 310 (Fourth Amendment protects business premises as well as homes). Such an expectation is not defeated merely because the area is accessible to others. *Taketa,* 923 F.2d at 673. This is because, as the Supreme Court stated in *Katz:*

the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amend-

---

5. The license also contains a number of provisions which could be said to bolster Thomas's expectation of privacy, including: (1) the Licensee, by continuous personal supervision, shall provide for the establishment, operation and maintenance of the business to make available appropriate goods and services; (2) the Licensee shall pay all utilities and taxes chargeable to the business under the terms of the license; (3) the Licensee shall perform cleaning and janitorial services with the license area, including removal of garbage and other debris, cleaning of floors, windows and fixtures, and shall maintain standards of cleanliness which will reflect favorable public opinion on the Licensee and the DNR; and (4) the Licensee shall maintain, keep in repair, and redecorate the interior of the concession and shall maintain and keep in repair all fixtures, furnishings and equipment provided by the DNR, including plumbing, heating and electrical equipment. The license further provides that, upon termination of the license, the DNR may "re-enter the premises" and obtain a new licensee for operation of the facilities.

ment protection. (citations omitted). But what he seeks to preserve as private, *even in an area accessible to the public,* may be constitutionally protected.

*Katz,* 389 U.S. at 351–52, 88 S.Ct. at 511, 19 L.Ed.2d at 582. (emphases added). In other words, "[p]rivacy does not require solitude." *Taketa,* 923 F.2d at 672.

■ While an expectation of privacy may be less weighty for commercial premises, *see New York v. Burger* (1987), 482 U.S. 691, 700, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601, 612, video surveillance has been recognized to be one of the most intrusive forms of searches performed by the government, regardless of the type of premises searched. *See United States v. Cuevas–Sanchez* (5th Cir.1987), 821 F.2d 248, 250–51; *Ricks v. State* (1988), 312 Md. 11, 537 A.2d 612, *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66. "To measure the government's intrusion we must consider the expectations of society." *Cuevas–Sanchez,* 821 F.2d at 251. In *Cuevas–Sanchez,* the Fifth Circuit stated that "[t]his type of surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state." *Id.* Similarly, in *United States v. Torres* (7th Cir.1984), 751 F.2d 875, *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150, the Seventh Circuit found that television surveillance in criminal investigations was "reminiscent of the 'telescreens' by which 'Big Brother' in George Orwell's *1984* maintained visual surveillance of the entire population of 'Oceania,' the miserable country depicted in that anti-utopian novel...." *Id.* at 877. We, too, believe that video surveillance is "exceedingly intrusive ... and inherently indiscriminate, and that it could be grossly abused—to eliminate personal privacy as understood in modern Western nations." *See id.* at 882.

While the campstore was accessible to the public, it was not a common area for all purposes. Thomas had a right of possession to the premises superior to that of the general public, pursuant to his license and concession agreement with the DNR. During business hours the general public had a limited right of access for the purpose of conducting business, but Thomas had a right of access to the premises at any time and the right and obligation to secure the premises from intruders by lock and key in his absence. The DNR's right to audit and inspect the concession did not render the area public for all purposes and confer upon it a corresponding right to invade the licensed area after business hours, install hidden video equipment and conduct video surveillance.

■ Video surveillance of a common or open area is generally not considered a search. *See Florida v. Riley* (1989), 488 U.S. 445, 449, 109 S.Ct. 693, 696, 102 L.Ed.2d 835; *see also People v. Lynch* (1989), 179 Mich. App. 63, 445 N.W.2d 803, 807 (video surveillance of common area in public restroom did not violate defendant's reasonable expectations of privacy). Indeed, we acknowledge that Thomas did not have an absolute expectation of privacy in the entire concession area. Further, by definition, a legitimate expectation of privacy means more than a subjective expectation of not being discovered. *See Rakas v. Illinois* (1978), 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387, 401 n. 12. However, reliance on the "open view" doctrine in the present case is misplaced.

## B. Intrusive Vantage Point

In the open view situation, the observation takes place from a non-intrusive vantage point. *Riley,* 488 U.S. at 449, 109 S.Ct. at 696, 102 L.Ed.2d at 841 ("As a general proposition, the police may see what may be seen *'from a public vantage point where [they have] a right to be,'"* ) (emphasis added). Thus, while Thomas would have no reasonable expectation of privacy against one who could observe his business activities from a vantage point accessible to the public in open view, that is not what occurred here.

The video surveillance conducted by the DNR's conservation officers occurred from a grossly intrusive vantage point, the campstore's attic and ceiling, which was an area not accessible to the public in open view. *See People v. Kalchik* (1987), 160 Mich.App. 40, 407 N.W.2d 627, 631 (video surveillance of closed stall in public restroom from vantage point in ceiling violated defendant's reasonable expectations of privacy); *accord Chubb*

*v. State* (1994), Ind., 640 N.E.2d 44 (public restroom stall enclosed by partitions *"not a public place"*). Whatever the general privacy interests Thomas may or may not have had inside the campstore, he had an actual, subjective and reasonable expectation of privacy against being videotaped from overhead during a four day period. *See Taketa,* 923 F.2d at 676; *see also State v. Bonnell* (1993), 75 Haw. 124, 856 P.2d 1265; *Kalchik,* 407 N.W.2d at 631.[6]

Thomas had an expectation of privacy in the campstore, subject to acts observable by the public from a public vantage point and to the lawful supervision of the DNR under the license agreement. As one commentator recently remarked, "[t]he citizen may expect, even risk, casual public observation without consenting to police surveillance." Gutterman, *A Formulation of the Value and Means Model of the Fourth Amendment in the Age of Technologically Enhanced Surveillance,* 39 Syracuse L.Rev. 647 (1988). Thus, while one's expectations of privacy generally do not extend to incidental or occasional looks by members of the public, we believe they do extend to prolonged observation by the government from a non-public vantage point. *See id.; State v. Kender* (1979), 60 Haw. 301, 588 P.2d 447, 451 ("while a defendant may have waived a reasonable expectation of privacy as to certain persons, he has not necessarily waived that right as against other sources"). Such is the case here.

### C. Third–Party Consent

■ Finally, in its brief on appeal, the State contends that if there was a search of the premises a warrant was not necessary because the State, as owner of the property, voluntarily consented to such a search. We disagree.

■ The State is correct that a valid consent to search obviates the necessity of a warrant. *Stallings v. State* (1987), Ind., 508 N.E.2d 550, 552. Generally, a third party with "common authority" over, or other suffi-

cient relationship to, the place or effects being searched can give valid consent. *United States v. Matlock* (1974), 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249–50; *Stallings,* 508 N.E.2d at 552. However, if the third party is acting as an instrument or agent of the police, the consent is invalid. *See Coolidge v. New Hampshire* (1971), 403 U.S. 443, 487–90, 91 S.Ct. 2022, 2048–50, 29 L.Ed.2d 564, 595–96; *United States v. Moore* (6th Cir.1990), 917 F.2d 215, 222–23, *cert. denied,* 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654.

Here, the DNR exploited its dual role as the licensor of the concession and as a law enforcement agency. Using its key, the DNR accessed the premises in its capacity as licensor, and then used its law enforcement division to collect evidence without a warrant. As licensor, the DNR had access to a key and a right to enter the premises, but that contract right did not confer upon the DNR acting as a law enforcement agency the right to enter the premises and install video equipment in the attic for the purpose of covert surveillance. To allow the existence of a master or duplicate key to overcome the expectation of privacy would defeat the legitimate privacy interest of any hotel, office, or apartment occupant. *See Taketa,* 923 F.2d at 673.

Therefore, we cannot agree with the State that the DNR's possession of a key to the campstore, because of its license agreement with Thomas, wholly defeated any expectations of privacy which Thomas reasonably held in the campstore. *See id.* But for the DNR's possession of a key, such repeated clandestine entries by its law enforcement officers, to inspect the premises, to install the equipment, to change the video tapes and to remove the equipment, would have constituted an unlawful entry and trespass. There was no valid consent to the search.

### CONCLUSION

It is well-settled that an area in which an individual has a reasonable expectation of

---

6. "Persons may create temporary zones of privacy within which they may not reasonably be videotaped, ... even when that zone is [in] a place they do not own or normally control, and in which they might not be able reasonably to challenge a search at some other time or by some

other means." *See Taketa,* 923 F.2d at 677 (citing *People v. Dezek* (1981), 107 Mich.App. 78, 308 N.W.2d 652, 654–55 (reasonable expectation of privacy from being videotaped in public restroom stall)).

privacy is protected by both the United States and Indiana Constitutions and, absent specific exceptions, cannot be searched without a warrant. Video surveillance is highly intrusive and amenable to abuse, and a *warrantless* video search poses a serious threat to privacy. Thus, because the constitutional guaranty against unreasonable searches must be liberally construed, such a warrantless and nonconsensual search is presumed to be unreasonable. *See Murrell v. State* (1981), Ind.App., 421 N.E.2d 638, 640; *Riddle v. State* (1971), 257 Ind. 501, 275 N.E.2d 788, 790.

We hold as a matter of law that, absent prior judicial authorization, the DNR's covert video surveillance of Thomas in the campstore violated his reasonable expectations of privacy and constituted an illegal warrantless search.[7] If the DNR had reason to believe that Thomas was committing a crime, then the DNR could have and should have presented facts to support that belief under oath or affirmation to a neutral magistrate to determine whether there was probable cause to authorize a search or seizure of Thomas' business records. The State failed in this regard. Thus, the trial court did not err when it granted Thomas's motion to suppress.

Affirmed.

BAKER, J. concurs.

ROBERTSON, J. dissents with opinion.

ROBERTSON, J., dissenting.

I respectfully dissent because the evidence will support no reasonable inference in favor of suppression. The State has demonstrated that Thomas entertained no reasonable expectation of privacy in the openly public transactions conducted in the campstore.

Upon review of the determination of the validity of a search, we consider the evidence favorable to the trial court's ruling and any uncontradicted contrary evidence. *Stallings v. State* (1987), Ind., 508 N.E.2d 550, 552. This Court will accept the trial court's findings of fact and conclusions unless clearly erroneous and will reverse the judgment only where the uncontradicted evidence will support no reasonable inference in favor of the ruling. *State v. Jorgensen* (1988), Ind.App., 526 N.E.2d 1004, 1006.

A search compromises the individual interest in privacy. *See Horton v. California* (1990), 496 U.S. 128, 133, 110 S.Ct. 2301, 2305–06, 110 L.Ed.2d 112. A search occurs when an expectation of privacy, which society is prepared to consider reasonable, is infringed. *Soldal v. Cook County* (1992), —— U.S. ——, ——, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (quoting *United States v. Jacobsen* (1984), 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85). Although the concepts of property and tort law are useful in an evaluation of whether one has an expectation of privacy, those concepts do not control the analysis. *See Rakas v. Illinois* (1978), 439 U.S. 128, 143–144 n. 12, 99 S.Ct. 421, 430–431 n. 12, 58 L.Ed.2d 387. Our decision therefore does not depend upon whether Thomas had a "lease" or a "license" but upon whether he had a reasonable expectation of privacy in what was searched.

The State asserts that the video surveillance was not a search inasmuch as the conduct was openly exposed to members of the public who utilized the campstore. This is essentially a contention that society does not recognize Thomas's expectation of privacy as reasonable because the government's intrusion did not infringe upon the personal and societal values protected by the Fourth Amendment. *See United States v. Cuevas–Sanchez* (5th Cir.1985), 821 F.2d 248, 251 (quoting *Oliver v. United States* (1984), 466 U.S. 170, 182–183, 104 S.Ct. 1735, 1743–1744, 80 L.Ed.2d 214). The facts and the law compel me to agree with this position.

Thomas arguably entertained the subjective expectation that, when he locked the store at the end of the business day, he thereby excluded others, including the DNR, from entry into the building. The events videotaped inside the store, however, did not transpire during non-business hours. The

---

7. As in *Taketa,* we base our holding on the principles espoused in *Katz,* and "upon our recognition of the exceptional intrusiveness of video surveil-

lance." *See Taketa,* 923 F.2d at 677. Our holding is likewise "limited to warrantless video surveillance for law enforcement reasons." *Id.*

subjects of the searches were the public, commercial transactions at the cash register during the business day. Under the circumstances, I must conclude that the uncontradicted evidence will support no reasonable inference in favor of the determination that Thomas entertained a reasonable expectation of privacy in the substance of those commercial transactions. While the license in question gave Thomas the right to use the interior of the building, arguably to the exclusion of the DNR and its agents, the license did not grant Thomas exclusive dominion over the commercial transactions in question, nor could it have done so. The camera videotaped commercial transactions which members of the public consummated on public land inside a public building. The transactions, by their nature, were public and not private.

> For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection ... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Katz v. United States* (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576.

Thomas did not seek to exclude others from access to the transactions. *See Katz,* 389 U.S. at 352, 88 S.Ct. at 511–512 (But what he sought to exclude when he entered the [telephone] booth was not the intruding eye—it was the uninvited ear). He did not seek to preserve the transactions as private. Given the nature of the transactions, Thomas could not have preserved them as private even if he had sought to do so. The license required the commercial sales to be conducted in full view of the customers, and the record provides no indication that the events captured on the video tapes constituted anything less.

The majority has characterized my position as the view that the area was not searched because it was not a constitutionally protected area and that Thomas had no expectation of privacy on the licensed premises in that the recorded transactions occurred during business hours in a place accessible

and visible to the public. This is altogether not my conclusion, as I do not base my opinion on an "open view" of the "common area" of the place searched. I have examined what Thomas knowingly exposed to the public, what he did not seek to keep private, that is, the substance of the commercial transactions.

The customers were additional parties to the transactions, and the videotape revealed nothing that questioning of the customers involved in those transactions would not also have revealed. The State compared the videotaped evidence with the cash register tape to establish that Thomas had engaged in transactions not recorded by the cash register. A subsequent interview with the camp-store's customers also would have shown that Thomas had engaged in transactions not recorded on the cash register tape. The record shows that Thomas openly exchanged merchandise for money with his customers. Regardless of the location from which the camera taped the events, Thomas had no reasonable expectation that these openly public transactions were, to the contrary, actually private.

While the majority bemoans that I ignore the surreptitious means by which the DNR accomplished the surveillance and the degree of intrusion inherent in the continuous nature of the surveillance, the majority has not addressed how it can characterize Thomas's expectations of privacy as reasonable when the State could have chosen to elicit information about the substance of the openly public transactions from the other parties to the events. I reject the notion that Thomas had a reasonable expectation in privacy in matters he shared with members of the public.

A legitimate expectation of privacy by definition means more than a subjective expectation of not being discovered. *Rakas,* 439 U.S. at 143–144 n. 12, 99 S.Ct. at 430–431 n. 12. Thomas may have entertained the subjective expectation that he would not be caught; but, in light of the manner in which he exposed the essential qualities of the transactions to the public, that expectation was not reasonable.

Searches conducted outside the judicial process, without prior approval by judge or

magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions. *See Minnesota v. Dickerson* (1993), —— U.S. ——, ——, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334. The evidence and the reasonable inferences solely support the view that the State bore its burden to show its conduct fell within one of those well delineated exceptions. The video camera taped open, observable, public, unexcluded, commercial transactions.

Although the State's actions may be offensive to my personal notions of how it should have conducted its investigation, its actions are not offensive of the Fourth Amendment. Although "video surveillance ... 'could be grossly abused'," majority at p. 245, it was not grossly abused under the facts of this case.

Reasonableness is still the ultimate standard under the Fourth Amendment. *Soldal,* at ——, 113 S.Ct. at 549. The reasonableness determination will reflect a careful balancing of governmental and private interests. *Id.*

The uncontradicted evidence will support no reasonable inference in favor of the position that Thomas's private interests outweigh the State's public and private interests discussed above. I would reverse the suppression.