William Haskell BLALOCK, Appellant,

v.

STATE of Indiana, Appellee.

Nos. 1085 S 392, 1–1184 A 276.

Supreme Court of Indiana.

Oct. 3, 1985.

Michael A. Douglass, O'Connor, Smith & Douglass, P.C., Brookville, for appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

Stephen J. Johnson, for amicus curiae Indiana Prosecuting Attorneys Assn.

Monica Foster, Indianapolis, for Indiana Public Defender Assn.

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the First District Court of Appeals brought by Appellee State of Indiana. William Haskell Blalock was found guilty in the Franklin Circuit Court of dealing in marijuana, a class C felony. Ind. Code § 35-48-4-10(b)(2) (Burns 1985). Blalock was sentenced to a term of five (5) years and fined $500.00.

The Court of Appeals found on direct appeal that the warrantless aerial surveillance of Blalock's greenhouse violated his Fourth Amendment rights and the affidavit was insufficient to establish probable cause to justify issuance of a search warrant. Accordingly, the Court of Appeals reversed Blalock's conviction. *Blalock v. State*, (1985) Ind.App., 476 N.E.2d 901. Since we disagree with both conclusions we vacate the opinion of the Court of Appeals and affirm the trial court.

There is very little, if any, dispute in the facts. In November, 1982, Blalock purchased seventy-seven (77) acres of heavily wooded land in a relatively isolated portion of Franklin County. There were two structures on the property. Near the entrance to the property was a mobile home which Blalock apparently used as a residence. In addition, Blalock erected a large pole barn with steel siding and a steel roof in a remote section of the property. The barn had one narrow window in one of its doors. Annexed to one side of the barn and stretching the entire length of the barn was a greenhouse. Three walls of the greenhouse as well as its roof were covered with a translucent corrugated plastic paneling. The fourth wall was formed by the adjoining wall of the pole barn. The structure was enclosed on three sides by a chain link fence permitting access only to the pole barn's windowed door and large sliding door. Blalock had also constructed a large partition inside the fence which shielded the greenhouse portion of the structure from the view of anyone approaching on the only available access road.

In mid-June of 1983 Detective Wieholter of the Indiana State Police received information from an individual that the individual had helped construct a barn-like structure at the end of Frazor Road in Franklin County, and had been warned by the owner

to say nothing about the building and act as if it did not exist. The information referred to the structure on Blalock's property.

Two Indiana State Police Officers, Detective Wieholter and Trooper Johnson, drove to the end of Frazor Road where they were confronted by a locked, heavy gauge metal fence preventing access to Blalock's property. From the padlocked gate the officers could see only what appeared to be a metal building, largely obstructed by trees. This was later discovered to be Blalock's mobile home. Arrangements were made for Trooper Johnson to take a flight in an Indiana State Police fixed wing airplane to view the area from the air. The plane was being used for routine fly overs of Franklin County to detect marijuana crops. Pilot Kelly and Trooper Johnson had been trained by the Federal Drug Enforcement Agency and other agencies on aerial identification of marijuana.

Kelly and Johnson flew over Blalock's property on August 19, 1983, circling the structure at an altitude of 800–900 feet. They clearly identified the structure as a greenhouse, as well as the chain link fence around the building, the isolated and remote location, and the absence of farm implements. Through the translucent roof of the greenhouse the officers were able to observe dark green plants of varying heights arranged in rows. Although they could not discern the number or shape of the leaves on the plants, based on the security precautions visible from the air, the remoteness of the area, and the color of plants visible under the translucent roof, the officers concluded marijuana was being grown inside Blalock's greenhouse. Photographs were taken of Blalock's property during the flights.

On August 21, Trooper Todd, also trained in aerial marijuana identification, flew over the same area with Pilot Kelly. Todd was not informed of either officer's suspicions or conclusions regarding the greenhouse. After the flight Todd concluded the greenhouse was being used for marijuana production.

On August 23, 1983 Officer Wieholter signed an affidavit for a search warrant prepared by the Franklin County Prosecuting Attorney. Based upon this affidavit a search warrant was issued for Blalock's pole barn and greenhouse. Officers executing the search warrant discovered a sophisticated greenhouse operation and large number of marijuana plants in various stages of maturity. Blalock's motion to suppress the evidence seized during the search of his pole barn and greenhouse was denied by the trial court.

I

Appellant claims the warrantless overflights by the police were in violation of the Fourth Amendment. All agree that the threshold inquiry in the Fourth Amendment analysis is whether or not a search has occurred. If no search has occurred it is irrelevant that the challenged governmental conduct is unreasonable. Only after finding that a certain governmental intrusion constitutes a search do Fourth Amendment safeguards become available.

In his concurring opinion in *Katz v. United States,* (1967) 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, Justice Harlan set forth the primary test articulated by the United States Supreme Court for discerning whether or not a search has occurred. The *Katz* test provides that the Fourth Amendment violation must establish that the defendant had an actual or subjective expectation of privacy and that the claimed expectation must be one which society recognizes as reasonable. *Smith v. Maryland,* (1979) 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226; *citing Katz,* 389 U.S. 247, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (Harlan, J., concurring). The significance of the subjective expectation of privacy is to show the defendant demonstrated a desire to exercise his right of privacy. This is necessary since if something is done in plain view of others with no effort to conceal it, there can be no claim of a Fourth Amendment violation.

The second prong of the *Katz* test, however, requires a determination of the reasonableness of the defendant's expectation of privacy. *Id.* In *Oliver v. United States*, (1984) 466 U.S. 170, 104 S.Ct. 1735, 1740, 1743, 80 L.Ed.2d 214, 223, 227, the United States Supreme Court held:

"The Fourth Amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as reasonable.

\* \* \* \* \* \*

The test of whether an expectation of privacy is legitimate for Fourth Amendment purposes is not whether the individual chooses to conceal assertedly 'private' activity; rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment."

In *Oliver* the Court considered two cases with facts very similar to the case at bar. Regarding *Oliver*, police received reports that marijuana was being grown on the defendant's farm. Kentucky State Police narcotics agents arrived at the farm, drove past the defendant's house to a locked gate with a "no trespassing" sign, walked around the gate down a footpath, and found a field of marijuana over a mile from the defendant's house. In the companion case the Maine police received a tip that marijuana was being grown in the woods behind the defendant's residence. Police officers entered the woods by a path between the residence and a neighboring house and continued through the woods until they reached two marijuana patches fenced in by chicken wire and "no trespassing" signs.

In both cases the United States Supreme Court cited *Hester v. United States*, (1924) 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 in determining the "open fields" doctrine should be applied to ascertain whether the discovery and seizure of the marijuana was valid. In *Hester* the Supreme Court explained that Fourth Amendment protection is accorded to persons, houses, papers, and effects, but that the government's intrusion upon open fields is not an unreasonable search proscribed by the Fourth Amendment. *Hester*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898, 900.

In light of *Hester* and *Katz* the Supreme Court in *Oliver* held:

"[A]s a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or a commercial structure would not be. It is not generally true that fences or no trespassing signs effectively bar the public from viewing open fields in rural areas. . . . For these reasons, the asserted expectation of privacy in open fields is not an expectation that society recognizes as reasonable." *Oliver*, —— U.S. at ——, 104 S.Ct. at 1741, 80 L.Ed.2d at 224–225.

The common law distinguished open fields from the curtilage, the area immediately surrounding the home, affording Fourth Amendment protection only to the curtilage, not neighboring open fields. *Hester*, 265 U.S. at 58, 44 S.Ct. at 446, 68 L.Ed. at 900. The reason for this was expressed well in *Dow Chemical Co. v. United States*, (1984 6th Cir.) 749 F.2d 307, 314, *cert. granted* —— U.S. ——, 105 S.Ct. 2700, 86 L.Ed.2d 716 (1985) wherein the Sixth Circuit refused to recognize a theory of industrial curtilage:

"The doctrine of curtilage is grounded in the peculiarly strong concepts of intimacy, personal autonomy and privacy associated with the home. The home is fundamentally a sanctuary, where personal concepts of self and family are forged, where relationships are nurtured and where people normally feel free to express themselves in intimate ways. The potent individual privacy interests that inhere in living within a home expand into the areas that enclose the home as well. The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is not true simply in a mechanical sense because the areas are geographically proximate. It is true because peo-

ple have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house. Personal interactions, daily routines and intimate relationships revolve around the entire home place. There are compelling reasons, then, for applying Fourth Amendment protection to the entire dwelling area."

■ Justice Powell stated in *Oliver* that an open field need be neither open nor a field. *Oliver,* —— U.S. at ——, 104 S.Ct. at 1742, 80 L.Ed.2d at 225, n. 11. In other words, woods, brush, and water courses could be considered an open field under that doctrine. This of course cannot be interpreted to mean that the open field doctrine will apply to buildings and greenhouses *per se.* Where such structures are part of the curtilage or have some nexus with the curtilage, they will be afforded Fourth Amendment protection. But where, as here, the structure is separate from the curtilage and any relation with the curtilage is totally lacking, and the structure is situated in the midst of an open field, the open field doctrine will apply. We interpret the "open fields" doctrine as being concerned primarily with the character of the area as distinguished from the more highly protected curtilage.

■ We further feel an aerial search should be considered no differently than a search from the ground as it applies to things in plain view. While it is true a view from the air gives a broader and less obstructed view and is hence more subject to abuse and invasion of privacy, it is also true it has not been considered a search where police observe something in plain view that can just as easily be observed by a casual observer. *United States v. Barone,* (1964 2d Cir.) 330 F.2d 543; *Alcorn v. State,* (1970) 255 Ind. 491, 265 N.E.2d 413; *Koscielski v. State,* (1927) 199 Ind. 546, 158 N.E. 902; *see also Marshall v. United States,* (1970 5th Cir.) 422 F.2d 185; *Morris v. State,* (1977) 266 Ind. 473, 364 N.E.2d 132, *cert. denied* 434 U.S. 972, 98 S.Ct. 526, 54 L.Ed.2d 462 (1977).

■ The facts are clear in the present case. Police officers flew over various areas of Franklin County, including Blalock's property, at an altitude of 800–1,000 feet. It cannot be said they were in place where they had no right to be. From this vantage point they were able to clearly see the greenhouse and various security measures. They were also able to see the translucent roof of the greenhouse area and, through it, the plants. The same could be observed by any person casually flying over the area. There is no showing here that this area could in any way be described as part of the curtilage. Blalock's residence was at one end of the 77 acre property while the greenhouse was in a remote area at the opposite end. We therefore find that Blalock did not have the requisite expectation of privacy, and the information the police gained by their observations did not constitute a search.

Many jurisdictions have held similarly concerning aerial observations. *United States v. Marbury,* (1984 5th Cir.) 732 F.2d 390; *United States v. Allen,* (1980 9th Cir.) 675 F.2d 1373, *cert. denied* 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); *People v. Joubert,* (1981) 118 Cal.App.3d 637, 173 Cal.Rptr. 428; *Dean v. Superior Court,* (1973) 35 Cal.App.3d 112, 110 Cal. Rptr. 585; *State v. Knight,* (1980) 63 Hawaii 90, 621 P.2d 370; *People v. Lashmett,* (1979) 71 Ill.App.3d 429, 27 Ill.Dec. 657, 389 N.E.2d 888, *cert. denied* 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1981); *State v. Rogers,* (1983) 100 N.M. 517, 673 P.2d 142. A more stringent view has been taken by appellate courts in other jurisdictions where the aerial observations were made within the curtilage. *People v. Ciraolo,* (1984) 161 Cal.App.3d 1081, 208 Cal.Rptr. 93, *cert. granted* —— U.S. ——, 105 S.Ct. 2672, 86 L.Ed.2d 691; *People v. Cook,* (1984) 151 Cal.App.3d 1121, 199 Cal.Rptr. 204.

II

■ Blalock next claims there were not sufficient facts stated in the affidavit to justify the court in issuing the search

warrant. We do not agree. Probable cause to issue a search warrant does not require a demonstration of a *prima facie* showing of criminal conduct, nor does it require a demonstration that contraband will be found on the premises to be searched. Probable cause to issue a search warrant need only show there is a probability of criminal activity. *U.S. v. Freeman,* (1976 7th Cir.) 532 F.2d 1098, and *Everroad v. State,* (1982) Ind., 442 N.E.2d 994. The decision to issue the warrant should be based on the facts stated in the affidavit and the rational and reasonable inferences drawn therefrom. *Snyder v. State,* (1984) Ind.App., 460 N.E.2d 522.

■ During a routine aerial investigation for marijuana being grown, three specially trained police officers observed a greenhouse in a remote, wooded area heavily secured with chain link fences and barricades to prevent entry or observation. The officers also observed growing plants through the translucent roof that each of them opined was marijuana. It is not unreasonable a court would find probable cause that a crime was being committed to justify issuing a search warrant.

■ We further agree with Judge Neal in his dissent to the present case that even should the probable cause affidavit be found deficient, the good faith exception articulated by the United States Supreme Court in *United States v. Leon,* (1984) —— U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 would justify the police in executing the warrant thus rendering the evidence thereby found properly admissible. The information in the affidavit in question was approved by the prosecuting attorney who also prepared and filed the affidavit.

### III

In view of our above findings we will consider issues raised on the direct appeal and not decided by the Court of Appeals.

Blalock maintains the affidavit in support of the application for the search warrant was misleading and misrepresented certain facts to the court, and further, that the delay in issuing the warrant was excessive. We find no merit in either argument.

■ The facts show Officer Johnson flew over Blalock's greenhouse on Friday, August 19, 1983. In order to be sure of his conclusions he had Officer Todd fly over the property on Sunday, August 21, 1983. Monday, August 22, was the first opportunity Johnson and Todd had to compare opinions. The search warrant was issued one day later, on Tuesday, August 23, 1983. Thus, Johnson's observations preceded the warrant by four days, and Todd's observations preceded the warrant by two days. This is not an excessive period of time. Separations between facts and warrants of three days and two days have been held not to invalidate a warrant. *Tinnin v. State,* (1981) 275 Ind. 203, 416 N.E.2d 116; *Sowers v. State,* (1981) Ind.App., 416 N.E.2d 466. We held in *Ashley v. State,* (1968) 251 Ind. 359, 241 N.E.2d 264, 269:

> "Although there can be no precise rule as to how much time may intervene between the obtaining of the facts and the issuance of the search warrant, in dealing with a substance like marijuana, which can easily be concealed and moved about, probable cause to believe that it was in a certain building on the third of the month is not probable cause to believe that it will be in the same building eight days later."

Blalock has made no showing that the marijuana growing in the greenhouse could be expected to be moved from that scene within a period of two or four days or destroyed within that time span.

Blalock alleges Officer Johnson misled the court in his affidavit by stating the roof was a clear plastic or glass material when in truth, half of the roof was opaque metal and the other half was a semi-translucent, opaque white plastic, not flat like glass. An examination of the record, however, shows that Officer Johnson did refer to a roof which was half opaque metal and the other half clear plastic or glass. Although the composition of the greenhouse roof was described in a variety of ways, we cannot conclude there was any purposeful decep-

tion in the affidavits, nor that the actual composition of the roof was much different than that generally described.

Blalock also argues Officer Johnson misled the court by his use of the term "identified," referring to the marijuana plants. The State contends this is more a question of semantics than of substance. Blalock bases his argument on the fact that Officer Johnson was not able to *absolutely* identify the plants as marijuana, but rather, formed such an opinion from his observations. Officer Johnson's conclusion that the substance was marijuana based on his observations, was stated by the Prosecuting Attorney in the affidavit as Officer Johnson "identified" the plants as marijuana. Although one might question the accuracy of the Prosecuting Attorney's choice of words, it cannot be said the use of the word "identify" was meant to or did mislead the court.

For all the above stated reasons the opinion of the Court of Appeals is vacated and the trial court is in all things affirmed.

GIVAN, C.J., and DeBRULER, PRENTICE and SHEPARD, JJ., concur.