**Robert TRIMBLE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 40A01–0311–CR–437.

Court of Appeals of Indiana.

Oct. 20, 2004.

Ryan W. Redmon, Montgomery, Elsner & Pardieck, LLP, Seymour, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Robert Trimble appeals his convictions of abandonment or neglect of an animal, a Class B misdemeanor,[1] and harboring a non-immunized dog, a Class C infraction.[2] He raises three issues on appeal, one of which we find dispositive and restate as whether a warrantless search of a doghouse and seizure of a dog located in Trimble's yard was permissible under the Indiana and United States constitutions.[3]

We reverse.

## FACTS

Trimble lives on a farm in Jennings County where he kept a number of animals. For one to two years before the incident that gave rise to this action, he kept a miniature Doberman named Butchie for Butchie's owners, Michael and Vera Wilcox.

On February 17, 2003, Trimble was injured while working in his barn and he called Michael to take him to the hospital. After returning from the hospital Michael noticed Butchie's leg was entangled in a chain. Butchie was emaciated and his ears appeared frostbitten. His water pan was frozen and there was no food in the area.

---

1. Ind.Code § 35–46–3–7.

2. Ind.Code § 35–46–3–1.

3. We heard oral argument on August 17, 2004. We commend counsel for the quality of their oral advocacy.

Michael told his wife about Butchie's condition. She contacted her sister, who contacted the sheriff's department. A deputy spoke with Michael, then sometime after 10:00 that night went to the Trimble farm to investigate. The deputy did not attempt to obtain a search warrant. He pulled into Trimble's driveway and saw a doghouse behind Trimble's house by the edge of the driveway. The doghouse was located in Trimble's yard about three to five feet from the driveway and about thirty feet from Trimble's back door.

The deputy knocked on Trimble's back door but there was no response. He then went to the doghouse. Butchie was inside and would not come out. The deputy could see only Butchie's head. Because the deputy could not coax Butchie out, he grabbed the cable to which Butchie was secured and pulled Butchie out of the doghouse.[4] The deputy observed that Butchie was emaciated and had an injured leg. Animal control officials were summoned, and they seized Butchie. Trimble was convicted of abandonment or neglect of an animal and harboring a non-immunized dog.

## DISCUSSION AND DECISION

■ The standard of review for the denial of a motion to suppress evidence is similar to that regarding other sufficiency issues. *Divello v. State*, 782 N.E.2d 433, 436 (Ind.Ct.App.2003), *trans. denied* 792 N.E.2d 43 (Ind.2003). We determine whether the trial court's denial of the mo-

tion was supported by substantial evidence of probative value. *Id.* We will not re-weigh the evidence, and any conflicting evidence is considered in a light most favorable to the trial court's decision. *Id.* However, this review is different from other sufficiency matters in that we also consider uncontested evidence that is favorable to the defendant. *Id.*

### 1. *The Fourth Amendment Claim*

Trimble asserts the warrantless search that resulted in Butchie's seizure was improper because the doghouse was within an area where he had a reasonable expectation of privacy.[5] The State asserts the evidence was admissible under the "open fields" doctrine.

■ Under the Fourth Amendment, our analysis focuses on whether a person has a constitutionally protected reasonable expectation of privacy. *Id.* at 436. Any evidence found as a result of an unconstitutional search under the Fourth Amendment must be suppressed. *Id.* at 439. An individual may not legitimately demand privacy for activities conducted out of doors in fields, but may expect privacy in the area immediately surrounding the home. *Id.* at 436. That area is known as "curtilage," a term derived from Medieval Latin for "court" or "yard." *Id.* at 437.

■ Outbuildings on the grounds surrounding a dwelling are within the curtilage of the dwelling and are protected from intrusion [6] by the Fourth Amendment

---

4. The State does not acknowledge in its Statement of the Facts that the deputy had to pull Butchie out of the doghouse in order to observe Butchie's condition. The State does eventually acknowledge in its argument that the deputy "had to pull him out by his chain" as one of the deputy's actions in "coaxing Butchie out of the doghouse." (Br. of Appellee at 9.)

5. Trimble also argues the State lacked probable cause to carry out the search. The State does not address probable cause but rather appears to argue no probable cause was needed because the search was permissible under the "open fields" doctrine.

6. The State's argument on the Fourth Amendment issue is that Trimble "had no reasonable expectation of privacy in the doghouse." (Br. of Appellee at 8.) This argument misses the

and by the Constitution of Indiana, Art. I, § 11. *Hadley v. State,* 251 Ind. 24, 53, 238 N.E.2d 888, 903 (1968) (Hunter, J. dissenting), *reh'g denied* 251 Ind. 24, 242 N.E.2d 357 (1968), *cert. denied* 394 U.S. 1012, 89 S.Ct. 1629, 23 L.Ed.2d 39 (1969). There, the dissent surveyed a number of Indiana and federal decisions finding unreasonable searches of such buildings as a barn 70 to 80 yards from the dwelling; a metal garage adjacent to the dwelling house; a shed consisting of a chicken house and garage; a garage of a fraternity house in Indianapolis; a fire escape; a barn; and a smokehouse.

 When police enter onto private property in order to conduct an investigation or for another legitimate purpose and restrict their entry to places that other visitors would be expected to go, such as walkways, driveways, or porches, any observation made from these areas is permissible under the Fourth Amendment. *Divello,* 782 N.E.2d at 437. Accordingly, an individual does not have a reasonable expectation of privacy with regard to things or activities within a residence that may be observed by persons using their natural senses from places impliedly open to a visitor's entry. *Id.*

In general, this means that "if police utilize normal means of access to and egress from the house for some legitimate purpose, such as to make inquiries of the occupant … it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling." *Id.* (quoting 1 Wayne R. LaFave, *Search and Seizure* § 2.3(c) (3d ed.1996) (internal quotation omitted)). The implied invitation, however, applies only to recognized access routes reasonable under the circumstances. *Id.* at 436–37.

 The circumstances determining which portions of property may reasonably be viewed as open to visitors are determined on a case-by-case basis and will necessarily include consideration of the features of the property itself, such as the existence of walkways and fences or other obstructions to access or viewing, the location of primary residential entryways, as well as the nature or purpose for the visitor's call. *Id.* at 438. Common experience teaches that under normal circumstances, uninvited visitors coming to a residence to speak with an owner or resident are expected to come to the residence's most direct, obvious and prominent entryway, which in most cases is its front door. *Id.* Under most circumstances, uninvited visitors are also expected to leave by the same route after knocking on the front door and receiving no response. *Id.* The nature of the circumstances surrounding the visit can also affect the scope of the property open by implication. *Id.* For example, persons coming to the property on truly pressing or emergency matters could reasonably be expected to seek out residents through areas other than the front door. *Id.*

Two Indiana decisions offer guidance in distinguishing "curtilage" from "open fields." In *Blalock v. State,* 483 N.E.2d 439 (Ind.1985), Blalock purchased seventy-seven acres of heavily wooded land in an isolated area. Near the entrance to the property was a mobile home Blalock ap-

mark to the extent *Divello* and *Hadley* suggest the proper inquiry is whether there is a reasonable expectation of privacy in the *area* that is considered "curtilage" as opposed to each individual structure or other item within the curtilage. We therefore decline the State's invitation to hold that the constitutional protection afforded by the curtilage is necessarily lost when a structure or container located within the curtilage is not one typically considered "private."

parently used as a residence. Blalock erected a greenhouse "in a remote section" of the property. *Id.* at 440. Police officers arranged a flight in a State Police airplane to view the area. The officers identified the greenhouse and noted the isolated and remote location and absence of farm implements. Through the translucent roof of the greenhouse the officers saw what they determined was marijuana. Based on the warrantless aerial surveillance an officer signed an affidavit for a search warrant and a search warrant was issued for Blalock's pole barn and greenhouse. Blalock's motion to suppress the evidence seized during the search of his pole barn and greenhouse was denied. *Id.* at 441.

The *Blalock* court quoted *Dow Chemical Co. v. United States,* 749 F.2d 307, 314 (6th Cir.1984), *aff'd* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986):

> The doctrine of curtilage is grounded in the peculiarly strong concepts of intimacy, personal autonomy and privacy associated with the home. The home is fundamentally a sanctuary, where personal concepts of self and family are forged, where relationships are nurtured and where people normally feel free to express themselves in intimate ways. The potent individual privacy interests that inhere in living within a home expand into the areas that enclose the home as well. The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is not true simply in a mechanical sense because the areas are geographically proximate. It is true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house. Personal interactions, daily

routines and intimate relationships revolve around the entire home place. There are compelling reasons, then, for applying Fourth Amendment protection to the entire dwelling area.

In *Blalock*, as in the case before us, the application of the Fourth Amendment turned on the question whether the area the police viewed was an "open field" or "curtilage." The *Blalock* court noted an "open field" need not be "open" nor a "field" and it addressed the status of a structure based on its location:

> Where such structures are part of the curtilage or have some nexus with the curtilage, they will be afforded Fourth Amendment protection. But where, as here, the structure is separate from the curtilage and any relation with the curtilage is totally lacking, and the structure is situated in the midst of an open field, the open field doctrine will apply. We interpret the "open fields" doctrine as being concerned primarily with the character of the area as distinguished from the more highly protected curtilage.

*Id.* at 442–43.[7]

Our supreme court determined the area where the greenhouse was located could not be described as part of the curtilage. *Id.* at 443. Blalock's residence was at one end of the 77–acre property while the greenhouse was in a remote area at the opposite end. Blalock therefore did not have the requisite expectation of privacy, and the police observations did not amount to a search. *Id.*

In *Divello,* by contrast, we determined police officers did not limit their visit to areas that could reasonably have been viewed as open to them for their business. 782 N.E.2d at 438. Divello owned two properties. He lived at one of the houses

---

**7.** This statement also indicates the State's argument Trimble had no expectation of privacy

in the *doghouse* is not dispositive of the Fourth Amendment question.

and owned another house on a lot located just south of his residence. The officers were responding to an anonymous tip regarding the cultivation of marijuana. We acknowledged the police had information that suggested illegal activity but did not rise to the level necessary to justify anything more than a visit along the most obvious and direct route to the residence. *Id.* at 437–38.

After the officers elicited no response at Divello's residence they walked through Divello's back yard and through a gate to the second property. There they noticed a truck parked about four feet behind the house, partly in the grass and partly in the gravel where the driveway wrapped around behind the house. They ran the license plate number of the truck and one officer walked around the truck and looked underneath it. This brought him within a few feet of the house, and he smelled the odor of marijuana coming from the southwest corner of the house. The other officers came over and smelled the marijuana odor. One stated he had to be within about eighteen inches of the house in order to smell the odor.

We found the officers' initial entry onto the property where Divello lived was permissible, but the officers should not have crossed through the private backyard of that property and through a privacy gate to the other property. That area, we held, could not be regarded as one through which uninvited visitors would be expected to travel under the circumstances. *Id.* at 438. The officers' observation was therefore the result of constitutionally impermissible presence on Divello's property be-

cause when an officer walked around the truck and within four feet of the house, he had invaded the curtilage of Divello's property. Divello had a reasonable expectation of privacy in this area, and the officer's actions therefore violated the Fourth Amendment.[8] *Id.* at 439.

In the case before us the deputy pulled into Trimble's driveway at about 10 o'clock at night and saw a doghouse behind Trimble's house by the edge of the driveway. The doghouse was located in Trimble's yard about five feet from the driveway and about thirty feet from Trimble's back door. The deputy knocked on Trimble's back door and received no response. He then went to the doghouse. He could see only Butchie's head and could not determine at that point whether Butchie was wounded or underweight. The deputy then pulled Butchie out of the doghouse using the cable to which Butchie was secured.

Here, as in *Divello*, the police had information that suggested illegal activity but did not rise to the level necessary to justify anything more than a visit along the most obvious and direct route to the residence. Like the officer in *Divello*, the deputy invaded Trimble's curtilage when he left that "obvious and direct route" and pulled Butchie out of the doghouse even though he could not determine whether Butchie was wounded or emaciated. Trimble had a reasonable expectation of privacy in the area where Butchie's doghouse was located. The warrantless search of Trimble's curtilage and seizure

---

8. In his *Divello* dissent, Judge Sullivan opined the officers did not violate the curtilage by walking between the truck and the house: "If it is not a constitutional violation to enter upon a porch to knock upon a door, it is not a constitutional violation to enter upon an area further removed from the person's private home in order to continue the investigation as to the presence of the owner." 782 N.E.2d at 439 (Sullivan, J., dissenting). It is not apparent that the purpose of the police entry onto the Trimble property was to investigate the "presence of the owner"; rather, it was to investigate Butchie's condition.

of the dog therein was therefore improper under the Fourth Amendment.

## 2. *The Indiana Constitutional Claim*

The officer's search of Trimble's curtilage and seizure of Butchie also violated the Indiana Constitution. Article I, Section 11 of the Indiana Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

▮▮▮▮ The protection provided by the Fourth Amendment is the minimum amount of protection a state may provide for its citizens. *State v. Hanley*, 802 N.E.2d 956, 958–59 (Ind.Ct.App.2004), *trans. denied.* States are permitted to provide additional protection based on their state constitutions. *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind.2002) ("The Indiana Constitution has unique vitality, even where its words parallel federal language."). Although art. I § 11 of the Indiana Constitution appears to have been derived from the Fourth Amendment and shares the same language, we interpret and apply art. I § 11 independently from Fourth Amendment jurisprudence. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind.2004). Rather than looking to federal requirements such as warrants and probable cause when evaluating Section 11 claims, we place the burden on the State to show that under the totality of the circumstances its intrusion was reasonable.

▮▮▮▮ Searches or seizures have violated the Indiana Constitution when they did not violate the federal constitution.

*See, e.g., State v. Stamper*, 788 N.E.2d 862, 867 (Ind.Ct.App.2003) (search and seizure violated Indiana Constitution even though Stamper conceded the search was permissible under the Fourth Amendment), *trans. denied* 804 N.E.2d 747 (Ind.2003). It is the State's burden to demonstrate the constitutionality of a search. *Hanley*, 802 N.E.2d at 959. Article I, Section 11 must be liberally construed to protect Hoosiers from unreasonable police activity in private areas of their lives. *Stamper*, 788 N.E.2d at 865. Establishing that a defendant had no reasonable expectation of privacy does not always end our analysis of the reasonableness of a search. *Id.* at 866.

In *Stamper*, an Indiana State Police detective who had been involved in an arrest of Stamper a few months earlier conducted surveillance of Stamper's residence. He saw Stamper exit his home with a garbage bag in his hand and place the garbage bag at the bottom of the garbage pile on his property near the end of his driveway. A "No Trespassing" sign was posted on Stamper's property near the garbage pile. The detective later retrieved the garbage bag and found inside it a burned hand-rolled marijuana cigarette and rolling paper.

The detective obtained a search warrant for Stamper's property and found marijuana and oxycontin on Stamper's property. Stamper moved to suppress the evidence found as a result of the search warrant. Stamper testified that his sister's fiancé, and not a government-run service, collected his garbage. Additionally, he testified his property is fenced in except for the area by the road where the gate is located and the garbage is collected. The detective had to enter Stamper's property to retrieve the garbage bag, which was located approximately ten feet from the street.[9]

9. We distinguished cases involving the search

and seizure of garbage left at the curb in front

The State contended Stamper had no reasonable expectation of privacy in a garbage bag left with other garbage bags near the road for collection.[10] *Id.* at 864.

We found the police intrusion unreasonable: "If we were to hold otherwise, police could search everyone's opaque garbage bags on their property without reason and thereby learn of their activities, associations, and beliefs. It is exactly this type of overbroad government intrusion that Article I, Section 11 of the Indiana Constitution was intended to prevent." *Id.* at 867 (citation omitted).

Trimble relies on the *Stamper* statement that coming onto the property is the "benchmark" for determining reasonableness under the Indiana Constitution. He asserts the search was unreasonable because the officer walked into his yard even though he saw nothing from the driveway that would give him suspicion a crime had occurred. Before the officer pulled Butchie out of the doghouse, he was not even sure the dog was the same one he had been told about.

 The State, as it did in its Fourth Amendment argument, focuses on the private nature of the *doghouse,* and not the area where it was located: "Hoosiers do not regard doghouses as private areas." (Br. of Appellee at 8.) The State does not address the reasonableness of the officer's entry into Trimble's yard, but instead appears to argue the search and seizure, including "coaxing" (*id.* at 9) Butchie out of the doghouse, were reasonable because

the officer did not have to "wander around" (*id.* at 9) Trimble's property to find the doghouse as it was located by the driveway, and because "had [the officer] waited long enough, the dog eventually would have exited his shelter on his own accord." (*Id.*)

We decline the State's invitation to hold that a warrantless search and seizure within a curtilage is necessarily "reasonable" if it can be accomplished without "wandering" in the curtilage or if the evidence sought would likely reveal itself if the police "waited long enough." Under the facts before us we find the warrantless search of Trimble's yard and removal of Butchie from his doghouse unreasonable under art. I § 11 of the Indiana Constitution.

### 3. *Exigent Circumstances*

The State argues even if Trimble had a reasonable expectation of privacy or the search was otherwise unreasonable, the warrantless seizure was justified by exigent circumstances. It was not.

 Exigent circumstances that justify a warrantless search include: (1) to prevent bodily harm or death; (2) to aid a person in need of assistance; (3) to protect private property; and (4) to prevent actual or imminent destruction or removal of evidence before a search warrant may be obtained. *Willis v. State,* 780 N.E.2d 423, 428 (Ind.Ct.App.2002). The State bears the burden of proving an exception to the

---

of a house and where the police conducted themselves in the same manner as those who pick up the garbage and did not trespass onto private property. In the latter the searches were not unreasonable. We noted in those decisions "coming onto the property was the benchmark. As long as the police did not have to enter the property, the search was considered reasonable." 788 N.E.2d at 865–66.

10. Stamper conceded the search and seizure was constitutionally permissible under the Fourth Amendment. However, he contended the search was not permissible under the Indiana Constitution. *Id.* at 864. Accordingly, the state's argument in *Stamper* missed the mark as well. *See id.* at 866 ("[E]stablishing the defendant had no reasonable expectation of privacy does not always end our analysis of the reasonableness of a search.")

warrant requirement existed at the time of the search. *Id.*

We note initially that Trimble was convicted of a misdemeanor and an infraction. The Supreme Court has noted that exceptions to the warrant requirement are few in number and carefully delineated, and the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). Hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. *Id.* at 750.

The burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut. *Id. And see State v. Straub,* 749 N.E.2d 593, 598 (Ind.Ct.App.2001) ("With regard to minor offenses, the Court has stated that the presumption of unreasonableness which attaches to the warrantless entry by the police into a home is difficult to rebut.") (citing *Welsh,* 466 U.S. at 750, 104 S.Ct. 2091).

The *Welsh* Court relied on Justice Jackson's concurrence in *McDonald v. United States,* 335 U.S. 451, 459–60, 69 S.Ct. 191, 93 L.Ed. 153 (1948), a prosecution for operating a "numbers" game. The Justice explained why a finding of exigent circumstances to justify a warrantless home entry should be severely restricted when only a minor offense has been committed:

> Even if one were to conclude that urgent circumstances might justify a forced entry without a warrant, no such emergency was present in this case. This method of law enforcement displays a shocking lack of all sense of proportion. Whether there is reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress as well as the hazards of the method of attempting to reach it.... It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it.... While the enterprise of parting fools from their money by the 'numbers' lottery is one that ought to be suppressed, I do not think its suppression is more important to society than the security of the people against unreasonable searches and seizures. When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

*Id.* at 751, 104 S.Ct. 2091.

The *Welsh* court noted that consistent with this approach, most lower courts have refused to permit warrantless home arrests for nonfelonious crimes. 466 U.S. at 752, 104 S.Ct. 2091 (citing *State v. Guertin,* 190 Conn. 440, 461 A.2d 963, 970 (1983) ("The [exigent-circumstances] exception is narrowly drawn to cover cases of real and not contrived emergencies. The exception is limited to the investigation of serious crimes; misdemeanors are excluded."); *People v. Sanders,* 59 Ill.App.3d 6, 16 Ill. Dec. 437, 374 N.E.2d 1315 (1978) (burglary without weapons not grave offense of violence for this purpose); *State v. Bennett,* 295 N.W.2d 5 (S.D.1980) (distribution of

controlled substances not a grave offense for these purposes)).

■■■ The State appears to argue the exigent circumstance in Trimble's case was the need to protect private property, *i.e.,* Butchie. It asserts there is a "strong public policy of protecting animals from abusive humans," (Br. of Appellee at 10) as demonstrated by numerous statutes that protect animals from mistreatment. Assuming *arguendo* such a public policy might in some cases support a finding of exigent circumstances that could permit a warrantless search and seizure in connection with the investigation of an infraction and a misdemeanor, the State has not overcome the presumption this warrantless search and seizure was unreasonable. Nor has the State demonstrated the officer could not have promptly obtained a warrant or that there would be "real immediate and serious consequences," *McDonald,* 335 U.S. at 460, 69 S.Ct. 191 had the officer waited to obtain a warrant.

Trimble argues that "[f]rom his lawful position in the driveway, [the officer] could see nothing that supported [the informant's] claim that an emergency situation existed." (Reply Br. at 8.) Indeed, the record reflects the officer could not have been aware of the "exigent circumstance" the State asserts until after he had completed the warrantless search and seizure—that is, after he pulled Butchie out of the doghouse.

We decline to hold that evidence an officer obtains after he has completed a warrantless search and seizure can also provide the "exigent circumstance" that

permits the warrantless search and seizure. *See Willis,* 780 N.E.2d at 429 ("*before* entry into a home to effectuate a misdemeanor arrest without a warrant, there must be exigent circumstances") (emphasis supplied). The State has not met its burden of proving an exception to the warrant requirement in the form of exigent circumstances existing at the time police searched Trimble's yard and seized Butchie.

## CONCLUSION

The police conducted a warrantless search of an area where Trimble had a reasonable expectation of privacy, and the officer's search of Trimble's yard and the seizure of Butchie, in the absence of exigent circumstances, was unreasonable under the totality of the circumstances. The search and seizure therefore violated both the Indiana and United States constitutions and we must accordingly reverse.

Reversed.

VAIDIK, J., concurs.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Judge, dissenting.

In the case before us, the deputy sheriff was responding to a credible report that the dog located in a doghouse at Trimble's residence was in need of food, water and medical attention.[11] He drove into the Trimble driveway where he could see the doghouse located about five feet from the driveway and approximately thirty feet from Trimble's back door. The deputy

---

11. The report to the sheriff's department was initiated by the owners of the dog. Mrs. Wilcox gave the information to her sister who in turn called the sheriff's office. Mr. Wilcox was then interviewed by the deputy sheriff who thereupon proceeded to the Trimble property. It is abundantly clear that the Wilcoxes are far from blameless in this matter. They failed to take action to remedy the situation when they had the opportunity to do so earlier and by such failure could be considered to have tacitly contributed to the dog's debilitated condition.

went from the driveway to the back door, knocked, and when he received no response, proceeded back to the doghouse. He could see the dog's head but the dog would not exit the doghouse, whereupon the deputy pulled the dog from the doghouse so that he could observe its condition.

Here, as in *Divello v. State*, 782 N.E.2d 433 (Ind.Ct.App.2003) *trans. denied*, the officer was present upon the property for the purpose of a law enforcement investigation. In *Divello* it was upon information that a substantial amount of marijuana was being harvested and sold. Here it was upon information that a dog was being neglected and was in poor physical condition. In *Divello*, the officers were in close proximity to the house because they were attempting to ascertain the presence of the owner. In the case before us, the deputy's attempt to summon the owner by knocking on the back door could be viewed as incidental to the purpose of the investigation.

My conclusion, as in *Divello*, is that the deputy here was in a place where he had a right to be, i.e. at the doghouse which was located further removed from the back door where he also had a right to be as part of his investigation. That conclusion does not end the inquiry, however. The question raised is whether the officer had a legitimate right or even an obligation to extract the dog from the doghouse in order to ascertain its condition.

In my view the intrusion to Trimble's right of privacy with respect to the dog and the doghouse was minimal in comparison to the very real likelihood that delay would exacerbate the dog's reported condition.

In short, the deputy sheriff was doing his job and did not carry out his responsibility by virtue of an unreasonable search and seizure.

For this reason, I would affirm the convictions.