COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, AtLee and Raphael
Argued by videoconference


CHELSEY DANIELLE INGRAM, S/K/A
  CHELSEA DANIELLE INGRAM

                                                            OPINION BY
v.        Record No. 1131-20-3          JUDGE ROBERT J. HUMPHREYS
                                                        DECEMBER 14, 2021
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Christopher B. Russell, Judge

Tyler M. Jerrell, Assistant Public Defender, for appellant.

Lauren C. Campbell, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


       At a bench trial conducted by the Circuit Court of Rockbridge County on September 22,

2020, appellant, Chelsey Danielle Ingram, was convicted of thirteen counts of animal cruelty, in

violation of Code § 3.2-6570(A), and one count of dumping trash on the highway, in violation of

Code § 33.2-802.  On appeal, Ms. Ingram challenges the circuit court's denial of her motion to

suppress as well as the sufficiency of the evidence to convict her of animal cruelty.

                                        BACKGROUND

       In reviewing a circuit court's denial of a motion to suppress, we view the evidence in the

light most favorable to the Commonwealth, "granting to it all reasonable inferences deducible

therefrom."  Thomas v. Commonwealth, 72 Va. App. 560, 574 (2020) (quoting Giles v.

Commonwealth, 28 Va. App. 527, 532 (1998)).  We apply the same standard in reviewing the

sufficiency of the evidence to support a conviction.  See Morgan v. Commonwealth, 73 Va. App.

512, __ (2021).

On February 12, 2020, Rockbridge County Sheriff's Office Deputy Ryan Knick and Sergeant Terry Martin responded to a dispatch alerting them to reports of a dog running at large near 944 Longhollow Road ("the home") and a second dog that was struck and killed by a vehicle in the same area. When the officers arrived at the location, they confirmed the above reports and approached the home in an attempt to contact the owner of the animals.

The home has two paths of approach: a long driveway that feeds into the public road and a set of wooden stairs about twenty yards up the road. The stairs led the officers up a small embankment, through the side yard of the house, past a door which had its upper panel removed on the first floor next to stairs leading up to a large front deck, and ultimately to the second-story front door of the home. The officers went up the stairs and knocked at the door on the deck; the officers heard dogs barking inside, but no one answered the door. The officers left the front door, descended the stairs, and then noticed a dog perched up on an object and peering over a missing window frame in the first-floor door.[1]

Deputy Knick approached the first-floor door and observed the dog perched on an old toilet. The first floor was "filthy, [with] urine, feces, and tons of garbage all over the place." Also, inside the home, close to the base of the door, was a dead dog. At the suppression hearing, Deputy Knick testified that he could see the dead dog by looking down from his location "a couple inches from [the door]." In response to multiple questions from Ms. Ingram's attorney asking Deputy Knick whether he had to "peek over" or "stick [his] head in" to see the dog, Deputy Knick maintained that he could see the dog from outside of the door without placing his head through the window frame.

---

[1] The dog was peering out of a space in the door where a window would have been.

From his location under the deck, Deputy Knick also heard dogs barking in an area outside the home and could see animals near a tree line about "forty to fifty yards" from the home. Deputy Knick crossed the front yard of the home, through a part of the yard that was not "manicured," and then reached a "patch of woods that wasn't too growed up [sic] that time of year." On top of the hill, Deputy Knick saw four dogs in various states of health, but three of the four dogs were visibly malnourished. The hill was not enclosed, nor were there any buildings on the hill. At this point, Deputy Knick relayed the information regarding the dogs to Deputy Daniel Trout who obtained a search warrant for the home. The material facts stated in support of the probable cause for the warrant were as follows:

> Sgt. Martin along with Deputy Knick located two deceased dogs located at the residence of 944 Longhollow Rd, Rockbridge County, VA. Two additional dogs were located in the curtilage of the residence and were found to be malnourished. Additional animals could be heard inside the said residence. This affiant believes a search of the residence and curtilage for the requested items would provide evidence to assist in prosecution for the said VA code [Code § 3.2-6570. Cruelty to animals]. As well to check the welfare of the animals inside.

Deputy Trout was not on the scene and simply relayed the information that Sergeant Martin and Deputy Knick provided him. A magistrate authorized the search warrant, and Deputy Knick and Sergeant Martin executed the warrant and seized ten live dogs and one deceased dog.

The home belonged to Bill Sensabaugh. Mr. Sensabaugh was renting the house to Ms. Ingram and Matthew Trussell. Following interviews, Ms. Ingram told officers that she had entered into an agreement with Mr. Sensabaugh to care for his two dogs in exchange for him paying for the food. When Mr. Sensabaugh did not pay her, she simply did not feed them. All told, fourteen dogs were found at the residence: two deceased dogs, two dogs that belonged to Mr. Sensabaugh, and ten dogs that had belonged to Ms. Ingram and Mr. Trussell. For purposes of clarity, law enforcement officers identified the dogs with numbers. Dog 1 and the body of

- 3 -

Dog 14 were found on the first floor and seized by the deputies. Dogs 4, 5, 6, and 8 were found on the hill and seized. Six dogs were found inside the residence: Dogs 2 and 9 shared a crate that was covered in feces and urine. Dogs 3 and 7 also shared a crate in similar conditions. The dogs in the crates were seized by the deputies. Dog 13 belonged to Mr. Sensabaugh and was found locked in a bathroom. Dog 12 also belonged to Mr. Sensabaugh and was found locked in a room with urine and feces and looked malnourished. Mr. Sensabaugh's dogs were returned to him. The dog running at large, Dog 10, was seized. The deputies instructed Mr. Trussell to bury Dog 11, the dog struck by the car.

The ten live dogs and the deceased Dog 14 were taken to the SPCA. Dog 14 was accidently disposed of prior to trial. When the dogs were examined by the SPCA, all but Dog 9 had worms. While in the care of the SPCA, most of the dogs rapidly gained substantial weight. SPCA staff testified that when the dogs were given food that they were "ravenous" and ate like "they had not seen food . . . in some time."

Prior to trial, Ms. Ingram filed a motion to suppress arguing that Deputy Knick violated the Fourth Amendment by conducting a search of the curtilage of the home. On September 22, 2020, the day of trial, the circuit court also heard Ms. Ingram's suppression motion. The circuit court ruled that "looking across the door, whether it was with the human eye or a camera at that point looking ahead into a window, an open window, a closed window . . . was an unlawful search of the house and the curtilage," but denied the motion on the grounds that the officers were entitled to rely on the warrant to seize the evidence under the good-faith exception to the exclusionary rule. At trial, the circuit court sustained Ms. Ingram's motion to strike the felony charge relating to the death of Dog 14. Ms. Ingram was found guilty of all misdemeanor animal cruelty charges and sentenced to 200 days, with 180 days suspended on three of the charges, and fined $100, with $50 suspended, for each of the ten remaining charges. This appeal followed.

ANALYSIS

I. The Motion to Suppress

Ms. Ingram assigns error to the circuit court's denial of her motion to suppress evidence.

Ms. Ingram argues that Deputy Knick violated the Fourth Amendment by engaging in a

warrantless search of her home and residence when he "entered the curtilage without any express

or implied permission and gathered evidence." Specifically, Ms. Ingram argues that Deputy

Knick violated the Fourth Amendment by "exceeding the scope of the invitation of the driveway

and the stairs, by poking your head [sic] through the window, by walking around the house

through the curtilage to get to the dogs up the hill." Ms. Ingram further argues that if Deputy

Knick obtained evidence by violating the Fourth Amendment, then under the fruit of the

poisonous tree doctrine, the illegal search taints future evidence that is the product of the illegal

search, including the warrant authorizing the search of the home. Ms. Ingram also contends that

the circuit court should not have applied the good-faith exception to the exclusionary rule

because no reasonably well-trained officer would have believed that the search was legal.

However, for the reasons that follow, we conclude that Deputy Knick did not violate the Fourth

Amendment and accordingly affirm the circuit court's denial of Ms. Ingram's motion to suppress

under the right result for a different reason doctrine. See Perry v. Commonwealth, 280 Va. 572,

579-82 (2010).

As noted above, the standard of review on factual determinations underlying a denial of a

motion to suppress is highly deferential and here leans heavily in favor of the Commonwealth.

Thomas, 72 Va. App. at 574. While we review the circuit court's determinations of historical

fact in this deferential light, we review the circuit court's legal conclusions based on those facts

de novo. See Curley v. Commonwealth, 295 Va. 616, 621 (2018). "We also presume—even in

the absence of specific factual findings—that the trial court resolved all factual ambiguities or

inconsistencies . . . in favor of the prevailing party." Hill v. Commonwealth, 297 Va. 804, 808 (2019).

Among the protections enshrined in the Fourth Amendment is the right of an individual to "retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961). It has long been recognized that, for Fourth Amendment purposes, the home includes more than the interior of a residence: the amendment's protections also extend to "the land immediately surrounding and associated with the home," an area referred to as "the curtilage." Oliver v. United States, 466 U.S. 170, 180 (1984). Because the curtilage is "considered part of home itself for Fourth Amendment purposes[,]" the amendment's protection against unreasonable searches applies to such areas. Id.

It is undisputed in this case that Deputy Knick entered the curtilage of Ms. Ingram's home by approaching the front door and the first-floor door. However, while the United States Supreme Court has held that a police officer's entry upon a citizen's curtilage to gather evidence is "presumptively unreasonable absent a warrant," there are several exceptions to this general presumption. Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018); see also Saal v. Commonwealth, 72 Va. App. 413, 422-23 (2020) (collecting cases).

Key to this presumption, however, is that law enforcement officers may not enter the curtilage *to gather evidence.* As such, the Supreme Court has noted that there is a license "implied from the habits of the country," for the general public to approach a home in the hopes of speaking with a resident. Florida v. Jardines, 569 U.S. 1, 8 (2013) (quoting McKee v. Gratz, 260 U.S. 127, 136 (1922)). Absent affirmative steps to rescind the invitation by the homeowner, the license "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. We have noted that this license also permits visitors to approach other areas that visitors "would be

expected to go" if the "'nature of the circumstances surrounding the visit' indicate that the visitor 'could reasonably expect to seek out residents through areas other than the front door.'" Robinson v. Commonwealth, 47 Va. App. 533, 550-51 (2006) (*en banc*) (quoting Trimble v. State, 816 N.E.2d 83, 88 (Ind. Ct. App. 2004)), aff'd, 273 Va. 26 (2007).  This license extends to law enforcement because "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do."  Kentucky v. King, 563 U.S. 452, 469 (2011).

Finally, so long as officers are within the geographic scope of the implied license, they "are free to keep their eyes open."  Robinson, 47 Va. App. at 550-51 (quoting State v. Seagull, 632 P.2d 44, 47 (Wash. 1981)).  However, as the United States Supreme Court made clear in Florida v. Jardines, 569 U.S. 1, whether an officer's actions fall within the implied license "depends upon the purpose for which [he or she] entered."  Id. at 10.  If the officer's "behavior objectively reveals a purpose to conduct a search," then a warrantless search of the home has occurred.  Id.; see, e.g., Robinson, 47 Va. App. at 550-51 (noting that use of sensory enhancing equipment, furtively approaching a home, or conducting a general investigation of the premises might reveal an officer's intent to conduct a search).

In this case, Ms. Ingram conceded at oral argument, and we agree, that Deputy Knick was within the scope of the implied license when he approached both the front door of the home and the first-floor door.  As the video exhibit clearly indicates, Deputy Knick approached the home from a reasonable path that visitors would be expected to take, approached the front door in a direct manner, and knocked on the door.  He then proceeded down the front stairs of the home and saw the front-facing door which was positioned to his immediate right at the bottom of the

stairs, as shown in this image taken from
Commonwealth's video Exhibit #1, in such a location
that a visitor "could reasonably expect to seek out
residents." Robinson, 47 Va. App. at 550 (quoting
Trimble, 816 N.E.2d at 88). Additionally, nothing in
the officer's behavior "objectively reveals a purpose to
conduct a search." Jardines, 569 U.S. at 10. Deputy
Knick simply approached two exterior doors at the



front of the house in the hopes of speaking to a resident about the dead dog he found in the road
by the house. Deputy Knick did not use sensory enhancing equipment, approach the home
surreptitiously, or engage in a general search of the home.

However, Ms. Ingram argues that Deputy Knick did more than simply approach the
first-floor door. Ms. Ingram argues that Deputy Knick stuck his head across and through the
opening that consisted of the missing upper half of the first-floor door to peer inside.
Ms. Ingram contends that if Deputy Knick stuck his head inside the door, he would have
exceeded the scope of the implied invitation and thereby violated the Fourth Amendment.
However, we need not decide whether Ms. Ingram's application of the law to those facts is
correct because they are not the facts of this case when considered in light of the standard of
review.

Whether or not Deputy Knick stuck his head inside of the door is a question of fact, and
we defer to the circuit court's findings of historical fact. Unless evidence has expressly been
rejected by a factfinder, we must consider the evidence in the light most favorable to the
Commonwealth, as the party that ultimately prevailed below, resolving any ambiguities and
inconsistencies in the evidence in its favor. While the circuit court found that Deputy Knick

violated the Fourth Amendment, we owe no deference to that legal conclusion and only give deference to its factual underpinnings, not the legal conclusion itself. The circuit court's ruling on this issue was that:

> [L]ooking *across* the door, whether it was with the human eye or a camera at that point looking *ahead into* a window, an open window, a closed window, I think that was an unlawful search of the house and the curtilage, but so I think it's a well taken point.

(Emphasis added). The circuit court's ruling credits Deputy Knick's testimony that he did not physically put his head across the window, but merely looked into the window. Deputy Knick repeatedly testified that he was able to see the dead dog from his vantage point *outside* the door. Because Deputy Knick was within the scope of the implied license by simply approaching the door, he was entitled to "keep his eyes open" and rely on his observations obtained from this lawful vantage point. Robinson, 47 Va. App. at 550-51 (quoting Seagull, 632 P.2d at 47). The cell phone footage taken following the execution of the search warrant at one point shows the camera being held over the threshold of the door. Nevertheless, as shown in still images from Commonwealth video Exhibit #1 reproduced to the right, a later portion of the video shows the dead dog plainly visible from outside the door. This video evidence supports Deputy Knick's testimony that he was able to see the dead dog without crossing the threshold of the door. Because we view the evidence in the light most favorable to the Commonwealth, we base our analysis on the fact that Deputy Knick did not cross over the threshold of the first-floor door with his head or any other part of his body and need not reach Ms. Ingram's argument that doing so would violate the Fourth Amendment.





Finally, Ms. Ingram also argues that Deputy Knick violated her Fourth Amendment rights regarding the search related to the dogs on the hill in two ways: first, because the hill was part of the curtilage, and second, if the hill was not part of the curtilage, Deputy Knick nonetheless had to cross the curtilage to get to the open fields, thereby violating the Fourth Amendment. We disagree.

The Fourth Amendment does not prohibit searches of so-called open fields. Oliver, 466 U.S. at 179. If private property is neither the home nor part of the curtilage, then the Fourth Amendment simply does not apply. See id. at 180. Whether a portion of property is "curtilage" is determined by a four-part totality of the circumstances test laid out in United States v. Dunn, 480 U.S. 294, 301 (1987): (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by."

The circuit court did not reach this issue; however, application of the Dunn factors, to the evidence in the record in the light most favorable to the Commonwealth, leads us to conclude that the hill where the dogs were found was an open field and not a part of the curtilage. First, the hill was not close to the home. The hill was approximately forty to fifty yards from the home; the Dunn Court found that sixty yards from a home was a substantial distance. Id. at 302. Second, the area was not enclosed. The hill contained no fencing, walls, or any other boundary marking. Third, the record does not reflect that the hill was put to any use by the residents of the home; the only use for the hill was as a location to keep the dogs. Finally, Ms. Ingram did not take any steps to protect the area from observation; Deputy Knick testified that he could see the dogs from the porch and driveway. The hill was clearly an open field for purposes of the Fourth

Amendment, and any search conducted there was beyond the scope of the Fourth Amendment protection.

Ms. Ingram nonetheless argues that because Deputy Knick had to enter and cross her curtilage (the front yard) to reach the open fields, he violated the Fourth Amendment. However, it is axiomatic that the Fourth Amendment only applies to searches and seizures and whether the constitutional protection of the Fourth Amendment applies is based upon the location of the search or seizure. It does not prevent the government from merely entering private property. Deputy Knick likely departed from that portion of the curtilage where he had an implied license to be present, and he did so for the purpose of investigating the condition of the dogs on the hill. However, because the place where he actually conducted his search and seizure was an open field not protected by the Fourth Amendment, there was no constitutional violation as to the evidence found there. See Cosgrove v. State, 806 P.2d 75, 78 (Okla. Crim. App. 1991); United States v. Traynor, 990 F.2d 1153, 1157 (9th Cir. 1993), overruled by United States v. Johnson, 256 F.3d 895, 913 n.4 (9th Cir. 2001) (*en banc*) (overruling Traynor on procedural issue, but citing it for its substance).

Accordingly, because we find that Deputy Knick did not violate the Fourth Amendment, we affirm the circuit court's denial of Ms. Ingram's motion to suppress.

## II. The Sufficiency of the Evidence

On review of the sufficiency of the evidence, "the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." Smith v. Commonwealth, 296 Va. 450, 460 (2018) (quoting Commonwealth v. Perkins, 295 Va. 323, 327 (2018)). The question on appeal, is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Yoder v. Commonwealth, 298 Va. 180, 182 (2019) (emphasis omitted) (quoting Smith, 296 Va. at 460). In viewing the

- 11 -

evidence, "inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact." Hancock v. Commonwealth, 12 Va. App. 774, 782 (1991). The "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind" to convict. Karnes v. Commonwealth, 125 Va. 758, 764 (1919).

Ms. Ingram argues that the circuit court erred by finding that the Commonwealth presented sufficient evidence of animal cruelty as defined by Code § 3.2-6570(A) because the convictions were based solely on the condition of the animals at one point in time. Specifically, Ms. Ingram argues that the evidence only shows the dogs were underweight on one particular day and did not show how the dogs got to the condition they were in, or over what stretch of time. Because the Commonwealth introduced extensive evidence of the dire conditions of the animals when they were found, a rational trier of fact could have inferred that their conditions were due to Ms. Ingram's deprivation of care.

Ms. Ingram was indicted on thirteen counts of animal cruelty in violation of Code § 3.2-6570(A). The indictments specifically allege that:

> On or between January 15, 2020 and February 12, 2020, did, unlawfully, knowingly and intentionally ill-treat or abandon an animal . . . whether belonging to herself or another, or deprive such animal of necessary food, drink, shelter, or emergency veterinary treatment, or engage in or in any way further any act of cruelty to such animal, in violation of § 3.2-6570(A) of the 1950 Code of Virginia (1950), as amended.

Accordingly, the Commonwealth needed to present evidence *either* that Ms. Ingram (1) knowingly ill-treated or abandoned the dogs; (2) deprived them of necessary food, drink, shelter, or emergency veterinary treatment ("necessaries"); or (3) engaged or furthered any act of cruelty.

Here, the Commonwealth presented substantial evidence that Ms. Ingram deprived the animals of necessaries. The animals were kept in deplorable living conditions. Dog 1 was kept

next to a dead animal with urine, feces, and garbage spread throughout the living space. Additionally, the Commonwealth showed that four dogs were crated in the home, but that there were two dogs per crate, which Deputy Knick testified were too small for the dogs and can be seen in Exhibit 1 with feces and urine on the floor. Dog 12 was also kept in a room filled with feces and urine.

The evidence also showed that the dogs did not have access to food or water. Deputy Knick testified that Dog 13 was locked in a bathroom without access to food and without a drinking bowl other than the toilet. None of the other dogs located in the residence had access to food or water. Additionally, there was no food placed outside for the animals on the hill. Most significantly, Ms. Ingram admitted to officers that she was not providing sufficient food for Mr. Sensabaugh's dogs. Ms. Ingram said that Mr. Sensabaugh asked her to care for some of the dogs and she accepted on the condition that he would provide money for food. When he did not, Ms. Ingram did not feed the animals.

Additionally, the conditions of the animals were so obviously drastic that a factfinder could reasonably infer that the animals were deprived of food and water by Ms. Ingram for longer than "one point in time." The images and video introduced by the Commonwealth of all the animals are striking. The animals were emaciated, and nine of the ten dogs taken to the SPCA had worms.

The evidence that Ms. Ingram neglected these dogs is substantial. Contrary to Ms. Ingram's argument, the condition of the animals at one point in time was sufficient for a reasonable factfinder to conclude that the neglect of the animals had been ongoing.

- 13 -

CONCLUSION

For the reasons stated above, we affirm the circuit court's ruling on the motion to suppress and affirm each of Ms. Ingram's convictions for animal cruelty in violation of Code § 3.2-6570.

Affirmed.